**Jean MATHESON**

v.

**The BANGOR PUBLISHING COMPANY, d/b/a The Bangor Daily News and V. Paul Reynolds.**

Supreme Judicial Court of Maine.

Argued April 28, 1980.

Decided May 28, 1980.

Kobritz & Hamilton, Harold C. Hamilton (orally), Bangor, for plaintiff.

Eaton, Peabody, Bradford & Veague, Bernard J. Kubetz (orally), Bangor, for defendants.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN and ROBERTS, JJ.

PER CURIAM.

This report under M.R.Civ.P. 72(c) seeks our interlocutory review of a Superior Court ruling that defendant Reynolds in a discovery deposition must reveal the identity of a source of information he allegedly consulted prior to writing an editorial for the *Bangor Daily News*. Since we conclude the constitutional issue attempted to be raised by the parties is not appropriate for us to address on this record and at this stage of the proceeding, we discharge the report as improvident.

This report comes to us on an agreed statement of facts. Plaintiff Jean Matheson brought this action in the Superior Court, on behalf of herself and her thirteen-year-old daughter, Jenny Selk, for alleged invasion of privacy by an editorial entitled "An extra kid" written by defendant Reynolds and published on June 12, 1978, by the *Bangor Daily News*.[1] The Matheson complaint set forth two separate counts, based apparently on sections 652D ("Publicity Given to Private Life") and 652E ("Publicity Placing Person in False Light"), respectively, of the *Restatement (Second) of Torts* (1976). Count I alleged that the matter publicized by the editorial was of a kind that would be highly offensive to a reasonable person and that was not of legitimate concern to the public. Count II alleged that the editorial placed the mother and daughter before the public in a false light, which would be highly offensive to a reasonable person, and that defendant Reynolds had knowledge of or acted in reckless disregard as to the false light in which they would be placed. In plaintiff's view the *Bangor Daily* editorial placed her and her daughter in a false light by suggesting that Jenny was an extra or unwanted child, who felt unloved, and by suggesting that Jenny's mother did not love or properly care for her.

After defendants' motion for summary judgment had been denied by one Superior Court justice, plaintiff's counsel took the deposition of defendant Reynolds and of Mr. Banfield, the copy desk editor. During his deposition, Mr. Reynolds stated that before writing the editorial he had confirmed the accuracy and legitimacy of Jenny's advertisement by speaking to a person who knew plaintiff and her daughter. Mr. Reynolds refused to disclose the identity of his source or the conversations he had had with other members of the newspaper's editorial board concerning the editorial. Mr. Banfield also refused to answer questions regarding the editorial process. Plaintiff thereupon moved for an order requiring "the deposees to answer Plaintiff's questions."

A second Superior Court justice heard plaintiff's motion and at the end of an opinion discussing only the question whether Mr. Reynolds must disclose his source, stated "Plaintiff's Motion is hereby GRANTED." He made no specific order compelling discovery. *Cf. State v. Baker*, Me., 390 A.2d 1086, 1089 (1978). While describing the source's identity as "crucial" to plaintiff's burden on her "false light" claim of establishing that defendants had acted with knowledge or in reckless disregard of the editorial's falsity, the Superior Court justice specifically stated that he did not "intimate that the evidence is sufficient for the jury to decide [that] the editorial sug-

---

1. The editorial read in full as follows:

### An extra kid

Nobody ever said that growing up was easy.

Grown-ups have a way of forgetting this axiom of adolescence. Kids, especially those who find it troubling to be neither fish nor fowl in the teenage years, never stop reminding themselves how tough it is to be sentenced forever to life as a minor.

This personal ad in the May 31st edition of Penobscot Times tweaked our curiosity—and our vague recollection of life as a blossoming humanoid:

*Miscellaneous*
*ANYONE interested in keeping an extra kid for 2 years call Jenny Selk 827–5971.*

The NEWS editorial board didn't call Jenny. We didn't dare, what with the price of food and clothing and higher education. But we wanted to. We wanted to know why Jenny considers herself "an extra kid."

Does she feel unloved? Parents moving away? Misunderstandings? We hope it works out okay for Jenny. The same goes for all the other wonderful young people who probably feel like extra kids sometimes too.

gests what Plaintiff claims, and hence that it [*i. e.*, the jury] could even reach the issue of Defendant Reynolds' 'actual malice'." The Superior Court's decision was silent as to plaintiff's questions to both deposees regarding conversations occurring during the editorial process.

Defendants moved to report the case to this court on the ground that Reynolds would be "irreparably harmed" unless he could have an interlocutory review concerning the disclosure of a confidential source. The Superior Court ordered the report under M.R.Civ.P. 72(c) because there was no established precedent in Maine involving compelled disclosure in an invasion of privacy action of a journalist's confidential source. The parties prepared an agreed statement as the record on report that included neither the entire materials submitted to the first Superior Court justice on defendants' summary judgment motion nor his ruling on that motion beyond the mere docket entry of denial.

The single question, which the parties have abstracted from the case in an attempt to get a binding Law Court decision even before discovery is complete and the case in order for trial in the Superior Court, arises from defendants' claim of a qualified privilege protecting journalists' confidential sources. Defendants argue that the claimed privilege is grounded in the freedom-of-the-press clauses of the federal First Amendment and of Article I, § 4 of the Maine Constitution. On the other hand, plaintiff cites persuasive authority to the contrary, including *Herbert v. Lando*, 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979), which stated:

> Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances. . . . "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."

Thus, the parties press this court to make the difficult resolution of a conflict between defendants' First Amendment rights and plaintiff's interest in the fair administration of justice.

■ Certain fundamental principles of appellate practice lead us to decline that task under the circumstances of this report. We have stated repeatedly that "the Law Court retains power to make its own independent determination whether in all the circumstances of a given case its decision 'on report' would be consistent with the Court's basic function as an appellate tribunal." *State v. Foley*, Me., 366 A.2d 172, 173 (1976). *Accord, Gendron v. Pawtucket Mutual Ins. Co.*, Me., 409 A.2d 656, 660 n.10 (1979); *State v. Placzek*, Me., 380 A.2d 1010, 1012 (1977). Report of a question of law prior to final disposition of the case by the Superior Court is a departure from the usual "final judgment" rule barring piecemeal appeals and should be used only on extraordinary occasions, so that the Law Court will not be compelled to act as an "advisory board for the direction of business of the court at nisi prius." *Fidelity & Casualty Co. v. Bodwell Granite Co.*, 102 Me. 148, 152, 66 A. 314, 316 (1906). Thus, our "power to discharge a report inheres not only in our right and interest to control our own docket, but in our general powers of superintendence and supervision over inferior tribunals." *Laverdiere v. Marden*, Me., 333 A.2d 701, 702 (1975).

We have also reiterated the undesirability of the Law Court's deciding constitutional issues prematurely or otherwise than in the context of a fully developed factual situation that demands a constitutional decision. *See Blackwell v. State*, Me., 311 A.2d 536, 537 (1973); *Johnson v. Maine Wetlands Control Board*, Me., 250 A.2d 825, 827 (1969), and cases cited therein. In both *Blackwell* and *Johnson*, reports were discharged because the agreed statements of fact were too meager to establish that determination of the constitutional questions at issue was *necessary* to a decision of the entire case, and thus the matters were reported prematurely. *See also State v. Colburn*, 134 Me. 494, 494, 182 A. 210, 210 (1936) (report discharged because agreed statement of facts was "insufficient to al-

low an intelligent decision of the problem presented").

■ It is true that in *Collett v. Bither*, Me., 262 A.2d 353 (1970), this court did entertain the report of a constitutional issue at the discovery stage, but we did so only because the Superior Court had specifically ordered Bither to answer an interrogatory that clearly deprived him of his constitutional privilege against self-incrimination. The constitutional issue and full factual situation are not posed as clearly or fully by the report in the case at bar as they were in *Collett*. First, we cannot decide the constitutional question of a journalist's First Amendment privilege in the abstract. Because the record before us does not reveal the basis for the denial of defendants' motion for summary judgment, we cannot simply assume it to be a holding that the subject editorial did place plaintiff in a false light so as to put into factual issue Mr. Reynolds' state of mind in writing it. Indeed, although he granted the discovery motion, the second Superior Court justice specifically cautioned that he was not finding there to be sufficient evidence even to get the false light claim to a jury. If plaintiff could not in any event have recovered on the only claim as to which she asserts the source's identity has any relevance, then the constitutional issue would not be reached. As M.R.Civ.P. 26(b)(1) makes clear, a party may compel discovery only of unprivileged matter that is relevant to the subject matter involved in the pending action. On this record we cannot adequately gauge the relevance[2] of the source's identity to plaintiff's "false light" claim.

In addition, the Superior Court never entered an order specifically directing defendant Reynolds to disclose the informer's identity, and it never reached the question of what sanction might be imposed if Reynolds refused to comply with a specific order compelling discovery. We do not know what defendants' reaction to a specifically threatened sanction for noncompliance would be.

■ It is entirely possible that this case and its constitutional question would never have reached the Law Court if it were not for the Superior Court's report. As we have previously warned:

[I]t often is not an efficient use of total court resources to report the case to the Law Court merely on the chance that its decision may turn out to be the one that finally disposes of the case.

*State v. Placzek, supra* at 1013.

Because this case was reported to us improvidently, the entry must be:

Report discharged.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

---

2. Mr. Justice Powell apparently sees a sliding scale of relevance:

Under present Rules the initial inquiry in enforcement of any discovery request is one of relevance. Whatever standard may be appropriate in other types of cases, when a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated.

*Herbert v. Lando*, 441 U.S. 153, 179, 99 S.Ct. 1635, 1651 (1979) (Powell, J., concurring).