1997 ME 63

Albert SWANSON, et al.

v.

The ROMAN CATHOLIC BISHOP
OF PORTLAND, et al.

Docket No. CUM–96–305.

Supreme Judicial Court of Maine.

Argued Nov. 5, 1996.
Decided April 4, 1997.

Douglas S. Carr, Peter S. Carlisle, Perkins, Thompson, Hinckley & Keddy, Portland, for Albert Swanson.

Judy R. Potter, Cape Elizabeth, for Ruth Swanson.

Frederick C. Moore, Thomas R. Kelly, Robinson, Kriger & McCallum, Portland, for Roman Catholic Bishop.

Peter DeTroy, Terry Fralich, Norman, Hanson & Detroy, Portland, for Fr. Maurice Morin.

Before: WATHEN, C.J., ROBERTS, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

WATHEN, Chief Justice.

[¶ 1] For the first time, we must decide whether courts may constitutionally impose and enforce a duty of employee supervision derived from secular agency principles against a religious organization. The issue is presented on the report of the interlocutory order of the Superior Court (Cumberland County, *Saufley, J.*) declining to dismiss Albert and Ruth Swanson's claim against the Roman Catholic Bishop of Portland, a corporation sole,[1] and Bishop Joseph Gerry in his personal capacity (hereinafter referred to collectively as "the church") for negligently supervising a member of the clergy. On constitutional grounds, the court dismissed a claim against the church for negligently selecting and training the priest but denied the motion to dismiss their claim for negligently supervising him.[2] On report, the church contends that the constitutional principles that bar plaintiffs' negligent selection and training claim bar their negligent supervision claim. We agree and remand with instructions to dismiss the remaining count against the church.

[¶ 2] The facts alleged in the complaint brought by plaintiffs against the church and Father Maurice Morin are as follows. Morin was the parish priest of Saint Gregory's Catholic Church in Gray and Mr. and Mrs. Swanson were parishioners. In 1990, plaintiffs approached Morin to discuss the possibility of remarrying in a Catholic ceremony. Morin "performed interviews" with the couple and "counseled" Mrs. Swanson individually. While doing so, he encouraged her to postpone her remarriage ceremony and initiated a sexual relationship with her.

[¶ 3] The complaint further alleges that Mr. Swanson also sought "counseling and guidance" from Morin, confiding that he suspected his wife was infatuated with another man. Morin acknowledged that Mrs. Swan-

son needed counseling, recommended two individuals who could help her, and indicated "that he would do all he could to help the situation." Shortly thereafter, Mr. Swanson returned and indicated to Morin that his wife's infatuation was with the priest. Morin acknowledged that this seemed to be true. He told Mr. Swanson, however, that he was trained to handle the situation and was "working with Mrs. Swanson on this issue." After this meeting, Mr. Swanson discovered the sexual relationship between Father Morin and his wife. Mrs. Swanson then filed a complaint for divorce.

[¶ 4] During the pendency of the divorce proceedings, plaintiffs' son committed suicide. They are now allegedly undergoing extensive marriage counseling, have experienced extreme emotional distress and psychological damage, and have incurred the costs of divorce litigation due to the actions of Morin. Plaintiffs filed their complaint in the Superior Court seeking damages against Morin for intentional and negligent infliction of emotional distress and negligent pastoral counseling. The claims against Morin are not before us. We are concerned only with the count of the complaint alleging that the church negligently selected, trained, and supervised Morin.

[¶ 5] After considerable discovery activity on the part of all litigants, the church moved to dismiss plaintiffs' claims of negligent selection, training, and supervision on the ground that Article I, section 3 of the Maine Constitution and the First Amendment of the United States Constitution bar such claims. The Superior Court dismissed the plaintiffs' claims of negligent selection and training, but permitted their negligent supervision claim to proceed. Upon the motion of the parties, the Superior Court reported the case to this Court pursuant to M.R.Civ.P. 72(c).

---

1. As found by the court, "(t)he Catholic church is not organized in the fashion of a typical business entity. The "corporation sole" in the person of The Roman Catholic Bishop of Portland appears to have the financial authority and responsibility for the local presence of the church. Bishop Joseph Gerry is the individual who has filled that position during the pertinent times in the case at bar."

2. Plaintiffs do not challenge the court's dismissal of their negligent selection and training claims before this Court on report. Other counts against the church for breach of fiduciary duty, fraud, and misrepresentation were dismissed by agreement pursuant to M.R.Civ.P. 41(a)(1).

[¶ 6] The exception to the final judgment rule created by M.R.Civ.P. 72(c) is narrow. *Luhr v. Bickford,* 661 A.2d 1141, 1142 (Me.1995). Questions of law reported must be of sufficient importance and doubt to outweigh the policy against piecemeal litigation. *Id.* If the First Amendment bars claims of negligent supervision against religious institutions, the church is entitled to protection from the very process of litigation itself. Further factual development is not required for resolution of the constitutional issue presented, and the issue admits of much doubt and is of great public importance. Although not required by Rule 72(c), our decision will in at least one alternative dispose of the action against the church. We conclude that the interlocutory ruling in this case was appropriately reported.

[¶ 7] The First Amendment to the United States Constitution and Article I, § 3 of the Maine Constitution both guarantee citizens the right to freely exercise their chosen religion and forbid the establishment of religion by the government.[3] When interpreting these guarantees, courts have generally held that states are forbidden from interfering in matters concerning religious doctrine or organization. By dictating neutrality on the part of the courts, our constitutions ensure that religious organizations remain free from "secular control or manipulation" and retain "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian O. Ch.,* 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952) (invalidating NY legislature's attempt to transfer control of Russian Orthodox Churches in NY from Moscow to governing church authority in the U.S.); *see also Kreshik v. Saint Nicholas Cathedral,*

363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (state court cannot interpret matters of strictly ecclesiastical concern in applying common law); *Parent v. Roman Catholic Bishop of Portland,* 436 A.2d 888 (Me.1981) (inquiry into authority of Bishop under canon law and into propriety of his exercise of that authority constitutionally impermissible).

[¶ 8] These principles "severely circumscribe[ ] the role that civil courts may play in resolving" disputes involving religious organizations or doctrine. *Presbyterian Ch. v. Mary E.B. Hull Mem.Pres. Ch.,* 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969). Courts, however, "do not inhibit free exercise of religion merely by opening their doors to [civil] disputes [and] there are neutral principles of law ... which can be applied...." *Id.; see also Jones v. Wolf,* 443 U.S. 595, 604, 99 S.Ct. 3020, 3026, 61 L.Ed.2d 775 (1979) (states may adopt a "neutral principles" approach to church dispute resolution); *Graffam v. Wray,* 437 A.2d 627, 634–635 (Me.1981) (adopting neutral principles approach to resolving church property disputes). In applying neutral principles to resolve church-related disputes, courts must not consider doctrinal matters, deferring "to the resolution of [any] doctrinal issue by the authoritative ecclesiastical body." *Jones,* 443 U.S. at 604, 99 S.Ct. at 3026.

[¶ 9] The plaintiffs contend that their claim for negligent supervision against the church can be resolved by the application of neutral tort principles. They argue that inquiry into the church's knowledge of any risk presented by Morin and the reasonableness of the church's supervisory acts involve nothing beyond the application of secular legal standards to secular conduct. We have never decided that the negligent supervision of an employee constitutes an independent

3. The First Amendment provides:
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....
 U.S. Const., amend. I.
 The Maine Constitution provides:
 All individuals have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, and no person shall be hurt, molested or restrained in that person's liberty or estate for worshipping God in the manner and season most agreeable

to the dictates of that person's own conscience, nor for that person's religious professions or sentiments, provided that that person does not disturb the public peace, nor obstruct others in their religious worship;—and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws, and no subordination nor preference of any one sect or denomination to another shall ever be established by law....
 Me. Const., art. I, § 3.

basis for liability on the part of an employer. Assuming that it does, however,[4] we conclude that constitutional considerations bar such a claim against the church in this case.

[¶ 10] The tort of negligent supervision is based upon the concept that principals have certain duties to supervise those under their control.[5] *See e.g. Moses v. Diocese of Colorado,* 863 P.2d 310, 323–327 (Colo.1993) (a prerequisite to establishing negligent hiring and supervision is an employment or agency relationship). When a civil court undertakes to compare the relationship between a religious institution and its clergy with the agency relationship of the business world, secular duties are necessarily introduced into the ecclesiastical relationship and the risk of constitutional violation is evident. The exploration of the ecclesiastical relationship is itself problematic. To determine the existence of an agency relationship based on actual authority, the trial court will most likely have to examine church doctrine governing the church's authority over Morin.[6] As the U.S. Supreme Court noted in one case, determining the authority of a religious body under religious law,

> frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church so as to decide ... religious law [governing church polity] ... would violate the First Amendment in

much the same manner as civil determination of religious doctrine.

*Serbian Eastern Orthodox Diocese, etc. v. Milivojevich,* 426 U.S. 696, 708–709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151 (1976) (citation omitted).

[¶ 11] Some courts have ruled that negligent supervision claims against churches may be resolved "without determining questions of church law and policies." *Isely v. Capuchin Province,* 880 F.Supp. 1138, 1151 (E.D.Mich.1995). This has led them to conclude that "no First Amendment issues are implicated which would mandate dismissal of the negligent supervision claims." *Id.; see also Moses v. Diocese of Colorado,* 863 P.2d 310, 321 (Colo.1993) (because the facts of the case do not require interpreting or weighing of church doctrine, the First Amendment is not a defense); *L.L.N. v. Clauder,* 203 Wis.2d 570, 552 N.W.2d 879, 886 (Wis.App. 1996), *petition for review granted,* 205 Wis.2d 133, 555 N.W.2d 814 (1996) (when church allegedly had notice of risk posed by clergy, determination of negligent supervision requires no interpretation of church doctrine). We conclude that these decisions have not fully addressed the fundamental issue in this case.

[¶ 12] Even assuming that the trial court could discern the existence of actual authority without determining questions of church doctrine or polity[7] or could base the requi-

---

4. The Bishop has not challenged the court's formulation or acceptance of this tort on report.

5. "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless ... in the supervision of the activity." Restatement (Second) of Agency, § 213 (1958).

    "A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
    (a) the servant
        (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
        (ii) is using a chattel of the master, and
    (b) the master
        (i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control."
Restatement (Second) of Torts, § 317 (1965).

6. The amount of control that the church has over Morin is in dispute, the church contending that canon law severely restricts the extent to which the Bishop may remove, transfer, and supervise the priest.

7. When applying neutral principles of law to resolve church-related disputes, courts may examine church documents. *Jones,* 443 U.S. at 604, 99 S.Ct. at 3026. (court may examine certain church documents, such as church constitutions, for language creating a trust when resolving church property disputes). This may be done when the document can be scrutinized in "purely secular terms" and the court is not required to rely on religious precepts in determining the question before it. *Id.*

site agency relationship on apparent authority,[8] constitutional obstacles remain. The imposition of secular duties and liability on the church as a "principal" will infringe upon its right to determine the standards governing the relationship between the church, its bishop, and the parish priest. "Beliefs in penance, admonition and reconciliation as a sacramental response to sin may be the point of attack by a challenger who wants a court to probe the tort-law reasonableness of the church's mercy toward the offender...." *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis.2d 302, 533 N.W.2d 780, 790 (1995), *cert. denied* —— U.S. ——, 116 S.Ct. 920, 133 L.Ed.2d 849 (1996) (quoting James T. O'Reilly & Joann M. Strasser, *Clergy Sexual Misconduct: Confronting the Difficult Constitutional and Institutional Liability Issues*, 7 St. Thomas L.Rev. 31, 47 (1994)). Because of the existence of these constitutionally protected beliefs governing ecclesiastical relationships, clergy members cannot be treated in the law as though they were common law employees. "The traditional denominations each have their own intricate principles of governance, as to which the state has no rights of visitation." *Schmidt v. Bishop*, 779 F.Supp. 321, 332 (S.D.N.Y.1991). Thus, "[i]t would ... be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained the defendant.... *Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination." Id.* (emphasis added). To import agency principles wholesale into church governance and to impose liability for any deviation from the secular standard is to impair the free exercise of religion and to control denominational governance. Pastoral supervision is an ecclesiastical prerogative.

[¶ 13] We recognize that there is limited authority for permitting negligent supervision claims to proceed when the plaintiff alleges that the defending church knew that the individual clergyman was potentially dangerous. *See Konkle v. Henson*, 672 N.E.2d 450 (Ind.App.1996); *Jones v. Trane*, 153 Misc.2d 822, 591 N.Y.S.2d 927 (Sup.1992); *Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d 584 (1991). We conclude, however, that these few courts have failed to maintain the appropriate degree of neutrality required by the United States and Maine Constitutions. Although "[t]he Supreme Court has consistently recognized that the religion clauses are subject to a balancing of interests test," the Court "has also concluded that certain civil rights protected in secular settings are not sufficiently compelling to overcome certain religious interests." *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1357 (D.C.Cir. 1990). We conclude that, on the facts of this case, imposing a secular duty of supervision on the church and enforcing that duty through civil liability would restrict its freedom to interact with its clergy in the manner deemed proper by ecclesiastical authorities and would not serve a societal interest sufficient to overcome the religious freedoms inhibited.

The entry is:

Judgment vacated. Remanded with instructions to enter an order dismissing the complaint as against defendants, the Roman Catholic Bishop of Portland and Bishop Joseph Gerry.

LIPEZ, Justice, with whom DANA, Justice, joins, dissenting.

[¶ 14] In my view, the report of the interlocutory order of the Superior Court was improvidently granted and should be discharged. For that reason, I must respectfully dissent.

[¶ 15] I agree with the Court's broad pronouncements about the severely circumscribed role that civil courts may play in resolving disputes involving religious organizations or doctrine. The free exercise provision of the First Amendment requires that limitation. Those pronouncements, however,

---

8. *But see Alicea v. New Brunswick Theological Seminary*, 244 N.J.Super. 119, 581 A.2d 900, 907–908 (App.Div.1990) (where locus of authority ambiguous, "insinuation by civil courts into the customs and usages of the bylaws and the constitution, into the administration and polity of the Church in the hope of uncovering clues" with respect to existence of apparent authority of member of church would "threaten the freedom of the Church from secular entanglement.").

are set forth prematurely, in contravention of the long-established principle that we do not decide constitutional issues unnecessarily. *Your Home, Inc. v. City of Portland,* 432 A.2d 1250, 1257 (Me.1981) (a court should avoid expressing opinions on constitutional law whenever a nonconstitutional resolution of the issues renders a constitutional ruling unnecessary); *Osier v. Osier,* 410 A.2d 1027, 1029 (Me.1980) (same); *see also United States v. National Treasury Employees Union,* 513 U.S. 454, ——, 115 S.Ct. 1003, 1019, 130 L.Ed.2d 964 (1995) (reiterating federal courts' policy of avoiding unnecessary adjudication of constitutional issues) (citing *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)).

[¶ 16] Moreover, we have been loathe to decide constitutional issues on interlocutory report pursuant to Maine Rule of Civil Procedure 72(c) when we have lacked the fully developed record that is often necessary to make the difficult judgments required by constitutional cases.[9] *See Sirois v. Winslow,*

585 A.2d 183, 184–85 (Me.1991) (constitutional issue should not be decided on report when plaintiffs have yet to establish underlying liability at trial level, the issue is posed in the abstract, and "the possibility is evident that but for the report by the Superior Court this case and its constitutional question would never reach this court")[10]; *Matheson v. Bangor Publ'g Co.,* 414 A.2d 1203, 1205–06 (Me.1980) (reiterating, in context of report involving First Amendment issue, the "undesirability of the Law Court's deciding constitutional issues prematurely or otherwise than in the context of a fully developed factual situation that demands a constitutional decision"); *see also* 2 Field, McKusick & Wroth, *Maine Civil Practice* § 72.5 at 144 (2d ed. 1970) ("Particularly in situations where the parties seek the determination of a constitutional question, the Law Court will hold the report to be premature if the record does not demonstrate that the constitutional determination is necessary to the disposition of the case."). We should be especially reluctant to decide a constitutional issue on report when, as here, the issue arises in an area of the law

9. Since Rule 72(c)'s adoption in 1959, *see* M.R.Civ.P. 72 reporter's note to 1959 amend., 2 Field, McKusick & Wroth, *Maine Civil Practice* 136 (2d ed. 1970), we have decided constitutional issues on an interlocutory report in only five instances. In *Collett v. Bither,* 262 A.2d 353 (Me.1970), we decided at the discovery stage whether requiring the defendant to answer an interrogatory violated his constitutional privilege against self-incrimination, and in *Huot v. Gendron,* 284 A.2d 899 (Me.1971), we decided a constitutional issue "almost identical to that presented and discussed at great length in *Collett v. Bither.*" As we later explained, our decision in *Collett* was warranted "only because the Superior Court had specifically ordered Bither to answer an interrogatory that clearly deprived him of his constitutional privilege against self-incrimination," and the report therefore clearly and fully posed "the constitutional issue and full factual situation. . . ." *Matheson v. Bangor Publ'g Co.,* 414 A.2d 1203, 1206 (Me.1980) (*per curiam*) (discharging a Rule 72(c) report). In *Miller v. Miller,* 677 A.2d 64 (Me.1996) (intervention of children in parents' divorce with attorney of their choice not constitutionally required), the issue posed did not demand full factual development, there was no question as to our recognition of the underlying cause of action, and there was little doubt that the matter eventually would be presented on appeal. In *Proctor v. County of Penobscot,* 651 A.2d 355 (Me.1994) (constitutionality of county entertainment ordinance), the motion for interlocutory review was filed after a

partial summary judgment had been granted, and the facts necessary for decision of the constitutional issue posed had been established. Likewise, in *North Sch. Congregate Hous. v. Merrithew,* 558 A.2d 1189 (Me.1989) (state constitutional right to jury trial in forcible entry and detainer action), we noted that the material facts were "simple" and undisputed.

We have been less reluctant to decide constitutional issues on reports pursuant to Rules 72(a) and 72(b); however, such reports place the entire action, rather than an interlocutory question, before us, and a Rule 72(b) report requires the parties' agreement to all material facts. *See* M.R.Civ.P. 72(a) & (b).

10. The dissent in *Sirois v. Winslow* asserts that we decided a constitutional issue on interlocutory report in *Portland Pipe Line Corp. v. Environmental Improvement Comm'n,* 307 A.2d 1 (Me.1973), *appeal dismissed,* 414 U.S. 1035, 94 S.Ct. 532, 38 L.Ed.2d 326 (1973), and that "we have entertained a broad spectrum of constitutional questions presented on interlocutory report." 585 A.2d 183, 185–86 (Me.1991) (Collins, J., dissenting). However, the constitutional issue in *Portland Pipe* was presented on a Rule 72(b) report and the only cases cited for the second proposition are *Collett v. Bither, see supra* note 1, and *State v. Bassford,* 440 A.2d 1059, 1061 (Me. 1982), in which we *discharged* a report pursuant to M.R.Crim.P. 37A(b) involving a constitutional issue of criminal law.

in which the U.S. Supreme Court cases offer limited guidance and there remains significant doctrinal uncertainty.[11] *See Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis.2d 302, 533 N.W.2d 780, 794 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 920, 133 L.Ed.2d 849 (1996) (Abrahamson, J., dissenting).

[¶ 17] This case demonstrates the wisdom of these principles of restraint. The plaintiffs' claims against Father Morin personally might fail at trial. If they do, there would be no basis for finding the church liable, and no need to decide the constitutional issues addressed by the court. Moreover, as the Court notes, we have never decided that the negligent supervision of an employee constitutes an independent basis for liability on the part of any employer. Instead of assuming that the church could be liable for negligent supervision, and addressing the constitutional issues on the basis of an assumption, we should first decide whether we will recognize that theory of liability in Maine. As a matter of logic, we should establish the general proposition before we exclude a specific application.

[¶ 18] In holding that the trial court should have dismissed the plaintiffs' negligent supervision claim, the Court concludes that constitutional considerations bar such a claim against the church "on the facts of this case." That qualification is at odds with the procedural posture of this case. In deciding a motion to dismiss, the court must take the material allegations of the complaint as pled, in the light most favorable to the plaintiff, and may grant the motion only if it appears beyond doubt that the plaintiff is entitled to no relief under any set of facts *that might be proved to support the claim. Shaw v. Southern Aroostook Community Sch. Dist.,* 683 A.2d 502, 503 (Me.1996) (emphasis added); *see* M.R.Civ.P. 12(b)(6). The plaintiffs allege that Father Morin used a pastoral counseling relationship to gain Mrs. Swanson's confidence and trust, initiate a sexual relationship with her, and advise her to seek a divorce from Mr. Swanson. They further allege that Father Morin concealed his actions from Mr.

Swanson when confronted by him, and that, "[a]s a direct result of the acts of Father Morin, both parties have experienced extreme emotional distress and psychological damage."

[¶ 19] Pursuant to the notice pleading of our rules, these allegations provide only the broad outline of a claim. Although the Court concludes that plaintiffs are not entitled to relief under any set of facts that might be proved to support such a claim, we do not have to speculate about facts that might make the claim of the plaintiffs against the church viable. The plaintiffs assert that they have determined through discovery that the Bishop had notice of Father Morin's difficulty in maintaining his vow of chastity and, despite that knowledge, took no steps to deal with his problem. This possibility of a threat of harm known to the church but disregarded by it was important to the trial court in permitting the negligent supervision claim to go forward. In response, the Court seems to say that the church can never be liable to a member of the public if the threat of emotional and psychological harm from a priest involves an adult sexual relationship between the priest and a parishioner arising out of a pastoral counseling relationship. I understand that the societal interest in protecting adults from such harm through civil redress in the courts may be less compelling than the societal interest in protecting children from harm. *See New York v. Ferber,* 458 U.S. 747, 756–57, 102 S.Ct. 3348, 3354–55, 73 L.Ed.2d 1113 (1982) (state's interest in safeguarding the physical and psychological well-being of a minor is compelling) (citing *Prince v. Massachusetts,* 321 U.S. 158, 166–67, 64 S.Ct. 438, 442–43, 88 L.Ed. 645 (1944) (right to practice religion freely does not include liberty to expose children to threats to their well-being)); *Osier,* 410 A.2d at 1030 (courts may protect children from religious practices that pose an immediate and substantial threat to their well-being). Nevertheless, I think the court acts prematurely in ruling out the possibility of such a claim for harm to

---

11. *Luhr v. Bickford,* 661 A.2d 1141, 1142 (Me. 1995), the only authority cited by the Court in setting forth our criteria for deciding an issue on interlocutory report, does not involve a constitu- tional claim and therefore does not address the concerns we traditionally have taken into account in such a case.

adults regardless of the particular facts of the case.

[¶ 20] The plaintiffs' claim that the negligence of the church caused them extreme emotional distress and psychological damage emphasizes that we are not dealing solely with matters of religious belief or internal church policy. There is a claim that a priest and the church caused harm to a husband and wife by abusing a counseling relationship. Although such a claim may ultimately be barred by the free exercise clauses of the Maine and United States constitutions, that judgment cannot be made without balancing the societal interest in protecting such parties from harm against the rights of the church to interact with its clergy without the threat of civil liability. The Court purports to make that difficult balancing judgment on the basis of abstractions. In my view, that judgment can be made only on the basis of a record developed within the circumscribed parameters established by the trial court.

[¶ 21] After dismissing the negligent hiring, retention, and training claims of the plaintiffs because of its accurate perception that "to rule otherwise would allow the state entry into an arena that has been and should remain the sole dominion of religious organizations," the trial court refused to dismiss the claim that focused on the contact between the priest and parishioners in a pastoral counseling setting. Still sensitive to the possibility of excessive state entanglement with church doctrine, the trial court limited the negligent supervision claim to allegations that: (i) the Bishop (or his agents) knew of conduct by the priest which a reasonably prudent person would have perceived as creating an "undue risk of harm" to third parties; (ii) the third parties at issue are owed a duty of care by the Bishop, and (iii) the Bishop failed to supervise that priest in a way that would reasonably limit that risk to others. With its inquiry limited to those allegations, the court concluded as follows:

> [T]he entanglement in religious doctrine is minimized. The questions presented to the factfinder will require inquiry into matters that are almost entirely secular: what did the Bishop know about the risk presented by the priest, when did he know it,

what action or actions did he take to reduce or eliminate the risk, were those actions the actions of a reasonable *supervisor* (not a reasonable Bishop) under the circumstances. Such an analysis will, if properly presented, involve the application of secular standards to secular conduct.

(Footnotes omitted.)

[¶ 22] Although the trial court's judgment that those carefully crafted limitations will prevent its excessive entanglement in religious doctrine may be optimistic, only the process of litigation can test that proposition appropriately. The litigation process will not necessarily require a trial of the claims against the church. After the completion of discovery confined by the court's rulings, the plaintiffs' negligent supervision claim might be resolved on a motion for a summary judgment. At a trial the court could bifurcate the proceedings, with Father Morin's liability being determined by a jury prior to any determination of the direct liability of the church. If the plaintiffs failed in their claims against Father Morin, the claims against the church would not be tried.

[¶ 23] I recognize that the church's participation in the litigation process—and especially a trial—could impose significant burdens that ultimately might be judged violative of constitutional protections. To have vindicated a constitutional right after the ordeal of litigation may be small consolation. That reality, however, must be weighed against the rights of the plaintiffs who claim injuries, and the inescapable fact that our rulings have reverberations beyond the specific case at hand. Those reverberations are particularly strong when they emanate from constitutional rulings. We should make such rulings only when required to do so and only on the most informed basis possible. The Court's decision ignores those prudential restraints.

[¶ 24] I would discharge the report, affirm the judgment entered in the Superior Court, and remand this case for further proceedings.