2004 ME 18

**Orlando E. DELOGU et al.**

v.

**CITY OF PORTLAND**

Supreme Judicial Court of Maine.

Argued: Nov. 7, 2003.

Decided: Feb. 20, 2004.

Orlando E. Delogu (orally), Portland, pro se.

Valerie Stanfill, Esq. (orally), Portland, for other plaintiffs.

Gary C. Wood, Esq. (orally), Donna M. Katsiaficas, Esq., Corporation Counsel, Portland, for defendant.

Panel: RUDMAN, ALEXANDER, and LEVY, JJ.*

Majority: RUDMAN, and ALEXANDER, JJ.

Concurrence and Dissent: LEVY, J.

RUDMAN, J., and ALEXANDER, J.

[¶ 1] This matter is before us on report with an agreed statement of facts, M.R.App. P. 24(b), from the Superior Court (Cumberland County, *Humphrey, J.*). The plaintiffs are homeowners and business property owners who pay real estate taxes to the City of Portland.[1] They assert that the Portland Property Tax Relief Program, Portland, Me., Code ch. 2, §§ 2–430 to 2–435 (2003), is an improper usurpation of the taxing authority reserved to the Maine Legislature by Article IX, Section 9 of the Maine Constitution and that it results in unequal apportionment and assessment of real estate taxes, violative of Article IX, Section 8 of the

---

* Justice Clifford sat at oral argument but did not participate in the development of this opinion.

1. Two of the twenty-one plaintiffs assert standing based on their status as renters of Portland real estate. To have standing, a party must have suffered an injury that is distinct from any harm suffered by the public-at-large. *Collins v. State*, 2000 ME 85, ¶ 6, 750 A.2d 1257, 1260. A party has standing when defendant's actions have adversely and directly affected that party's property, pecuniary, or personal rights. *Id.* A person who suffers only an abstract injury does not gain standing to challenge governmental conduct. *Id.* This Court can raise the issue of standing sua sponte because it is jurisdictional. M.R.App. P. 4(d); *Collins*, 2000 ME 85, ¶ 5, 750 A.2d at 1260. *See also Nemon v. Summit Floors, Inc.*, 520 A.2d 1310, 1312 (Me.1987). It appears that the renters lack standing in this action because they do not pay property taxes or qualify for property tax rebates.

Maine Constitution. Because the Portland Property Tax Relief Program results in an unequal apportionment and assessment of real estate taxes in the City of Portland and creates an abatement or exemption from real estate taxes, without legislative approval, we declare it invalid.

## I. CONSIDERATION OF REPORT

■ [¶ 2] A report on agreed facts, pursuant to M.R.App. P. 24(b), presents a case to us as if it were an original action, without any prior fact-finding or rulings of law by the trial court. Such a report "brings up to us the entire action and our duty is to 'determine' the whole case, as if we were sitting at *nisi prius,* on the basis of the stipulated facts and the reasonable inferences flowing therefrom." *Langer v. United States Fid. & Guar. Co.,* 552 A.2d 20, 20 (Me.1988).

[¶ 3] Consideration of this report is consistent with our judicial function. *Guardianship of I.H.,* 2003 ME 130, ¶ 6, 834 A.2d 922, 924. The question presented, involving the validity of a municipal real estate tax apportionment system, is a question of law of sufficient importance or doubt to outweigh our general policy against promoting piecemeal litigation. *See id.* Our resolution of the question can result in a decision that will finally resolve the question of the validity of the real estate tax relief program. *See Swanson v. Roman Catholic Bishop,* 1997 ME 63, ¶ 6, 692 A.2d 441, 443; *Maine Appellate Practice* § 24.2 (1st ed.2003).

## II. CASE HISTORY

[¶ 4] The essential facts of the case, based on the agreed statement of facts and its attachments, are as follows:

[¶ 5] The Portland Property Tax Relief Program was enacted on May 19, 2003, adopting Chapter 2, Article IX, §§ 2–430 to 2–435 of the Portland City Code. The original enactment was amended on June 16, 2003, principally to clarify and add justification language to the original enactment. The June 16, 2003, language is the operative language for purposes of our review. The June 16 amendment followed a letter to the City from the Attorney General questioning the constitutional validity of the original enactment unless further support and justification for it could be provided. The Attorney General's letter, among other points, cautioned that neither title 36 nor any other statute "allows a municipality to enact a full or partial exemption from tax for residential property owners for purposes of property tax relief."

[¶ 6] The property tax relief program is limited to owner-occupied homes with an assessed value of less than $400,000. Portland, Me., Code ch. 2, § 2–431 (2003). The amount of property tax relief provided by the program may vary from year to year, according to the valuation specified by a separate order of the City Council as entitled to a tax repayment. Section 2–434 provides: "The property tax relief payment for a homeowner shall be calculated by multiplying an amount of property valuation specified by council order times the tax rate in the fiscal year within which the tax is owed."

[¶ 7] For the 2003–2004 tax year, the City Council specified $15,000 to be the valuation to generate the tax repayment for property tax relief. Order 244–02/03. Multiplied by the tax rate of $26.80 per thousand dollars of valuation, this resulted in qualified homeowners being eligible for a real estate tax repayment of $402.[2] For

---

2. The stipulated facts indicate a repayment of $402.08. However, the specified $15,000 val-

uation for repayments, multiplied by the

tax year 2003–2004, the program was funded by an eighty-nine-cent per thousand-dollar valuation increase in the Portland tax rate applied to all property within the City.

[¶ 8] The tax repayments are not automatic. They must, like an abatement, be applied for, with the homeowners demonstrating qualification for the tax repayment. Portland, Me., Code ch. 2 § 2–432. The City has commenced payments to those individual homeowners who have applied and qualified for a tax repayment under the Portland Property Tax Relief Program.

[¶ 9] Shortly after the Portland Property Tax Relief Program was enacted, plaintiffs filed a complaint for a declaratory judgment in the Superior Court. The complaint sought to have the Superior Court declare the Portland Property Tax Relief Program to be violative of our State Constitution and to enjoin the City from (1) collecting the increased taxes authorized to pay for the program, and (2) accepting applications for property tax relief repayments authorized by the ordinance. The Superior Court denied a motion for a preliminary injunction and reported the legal questions to us pursuant to M.R.App. P. 24(b). We subsequently denied plaintiffs' renewed motion for a preliminary injunction.

[¶ 10] Plaintiffs assert that the Portland Property Tax Relief Program violates Article IX, Section 9 of the Maine Constitution, which states that: "The Legislature shall never, in any manner, suspend or surrender the power of taxation." The plaintiffs also assert that the Portland Property Tax Relief Program violates Article IX, Section 8 of the Maine Constitution, which states, subject to a number of exceptions for State legislative action, that:

$26.80 per thousand tax rate is $402. The

"All taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof."

## II. LEGAL ANALYSIS

[¶ 11] The City of Portland has unquestioned authority to assess and collect real estate taxes. The City's authority is conferred by 36 M.R.S.A. §§ 501–507, and 701–1084 (1990 & Supp.2003). This case presents the separate question of whether, consistent with the Maine Constitution, Article IX, Sections 8 and 9, the City may unilaterally adopt what may be viewed as an exemption, abatement, or tax repayment program absent explicit legislative authority.

[¶ 12] Article IX, Section 8 mandates equality, according to "just value," in the manner by which property taxes are both "apportioned and assessed." It prohibits municipalities from engaging in unjust discrimination in the assessment of real estate taxes or the apportionment of real estate tax burdens. *See Ram's Head Partners, LLC v. Town of Cape Elizabeth,* 2003 ME 131, ¶ 9, 834 A.2d 916, 919. A finding of discrimination is indicated when the municipal assessment system "necessarily results in unequal apportionment." *Id.* ¶ 10 (quoting *City of Biddeford v. Adams,* 1999 ME 49, ¶ 14, 727 A.2d 346, 349). The underassessment or overassessment of one set of similarly situated properties supports a finding of unjust discrimination. *Cf. Ram's Head Partners,* 2003 ME 131, ¶ 11, 834 A.2d at 919; *Adams,* 1999 ME 49, ¶¶ 15, 17, 19, 727 A.2d at 350. The same result occurs when selected properties receive an assessment reduction that does not benefit similarly valued properties.

$402 figure is used in this opinion.

[¶ 13] Under the Portland Property Tax Relief Program, the burden of Portland's real estate tax is apportioned unequally, with qualified homeowners effectively being taxed upon $15,000 less in property value than other similarly valued, or even identical, nonqualifying properties.

[¶ 14] The City argues that its property tax relief program is consistent with our precedent in cases such as *Delogu v. State*, 1998 ME 246, 720 A.2d 1153 and *McBreairty v. Commissioner of Administrative and Financial Services*, 663 A.2d 50 (Me.1995). The City contends that it has imposed and is continuing to impose an equal assessment on all properties, pointing to the distinctions we made in *Delogu* and *McBreairty*, between assessment of taxes and spending of tax revenues. *Delogu*, 1998 ME 246, ¶ 18, 720 A.2d at 1156; *McBreairty*, 663 A.2d at 54–55.

■ [¶ 15] The City's argument assumes that Article IX, Section 8 must be interpreted to provide Maine's municipalities with the same flexibility that we have accorded to the Maine Legislature in making tax assessment and tax-related spending decisions in relation to Article IX, Section 8. However, the history of Article IX, Section 8, combined with Article IX, Section 9, indicates that individual municipal governments must be treated very differently from the Maine Legislature, and that municipalities are prohibited from taking unilateral actions to adopt exemption, abatement, or repayment schemes that result in unequal apportionment of property tax burdens within their boundaries.

[¶ 16] Article IX, Section 8 has remained virtually unchanged since its adoption by the Constitutional Convention of 1819. The language of 1819 stated: "All taxes upon real estate, assessed by authority of this State, shall be apportioned and assessed equally, according to the just value thereof." ME. CONST. art. IX, § 8 (1819). Article IX, Section 8 now states: "All taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally, according to the just value thereof." The only differences from the original language are the addition of the words "and personal"[3] and the later adoption of five exceptions allowing the Legislature, but not individual municipalities, to approve deviations from the equal apportionment and assessment mandate to benefit certain specified programs. ME. CONST. art. IX, § 8, ¶¶ 1–5.

[¶ 17] While the exceptions to Article IX, Section 8 were adopted at a later time, the Constitutional Convention fully recognized the Legislature's capacity, considering issues on a statewide basis, to deviate from the equal apportionment and assessment mandate. Within the same document as Article IX, Section 8, the Constitutional Convention affirmed the validity of property tax exemptions previously adopted by the Massachusetts General Court and the capacity of our Legislature to exempt certain classes of real estate from property taxation.[4] This authority has been recog-

---

3. The words "and personal" were added in 1875. Amendment XVII, effective January 5, 1876; *State v. Hamlin*, 86 Me. 495, 502, 30 A. 76, 79 (1894). Amendment XVII also added Article IX, Section 9 to the Maine Constitution.

4. Article X, Section 5 of the Maine Constitution, as adopted in 1819, incorporated the Separation Act of the Commonwealth of Massachusetts which, in the "Seventh" part, specified: "And all lands heretofore granted by this Commonwealth, to any religious, literary, or eleemosynary corporation, or society, shall be free from taxation, while the same continues to be owned by such corporation, or society." 1819 Mass. Laws ch. CLXI, § 1.

Chapter CXVI of the Laws of 1821, the original laws of the State of Maine, included

nized in statute, currently 36 M.R.SA. §§ 651–661 (1990 & Supp.2003). The authority includes absolute exemptions, such as section 652(1)(A) for benevolent and charitable institutions, and exemptions of a certain value of real estate, such as section 653, granting a $5000 or $7000 exemption for residences of war veterans.

[¶ 18] We addressed our traditional deference to legislative action in *State v. Hamlin:*

> [T]he extensive exemptions of property from all taxation, such as the property of literary, benevolent and charitable institutions, acquiesced in for many years, without objection, afford a practical construction of sections 7[5] and 8[6] that they do not require an absolute equality; but that the Legislature may, in its discretion, exempt from taxation classes of property within the terms of these sections, although the effect is to increase the rate upon other assessable property, and may select classes of subjects from which duties and excises may be required, not, however, degenerating into arbitrary and oppressive burdens.

86 Me. 495, 503, 30 A. 76, 79 (1894).

[¶ 19] Our most recent cases addressing Article IX, Section 8 in detail, *Delogu* and *McBreairty,* confirm this historic accommodation of legislative apportionment and assessment-related decision-making. *McBreairty* involved the unique situation of the state being both a general state taxing authority and a municipal taxing authority in the unorganized territories. In that context, we held that authorization for reimbursement to municipalities, but not the unorganized territories, for the reduced taxes collected pursuant to the Tree Growth Tax Law, was not violative of Article IX, Section 8, because this was an expenditure of revenues. *McBreairty,* 663 A.2d at 54–55. *McBreairty* approved legislative action addressing those unique circumstances, but its particular focus was on the expenditure of revenues to reimburse municipalities for revenue losses resulting from a constitutionally authorized[7] current use valuation for certain properties.

[¶ 20] In *Delogu,* the Legislature explicitly authorized the City of Bath to rebate to Bath Iron Works a total of $85 million in property taxes over a twenty-five-year period. Other parts of the incentive package included reimbursement by the State to BIW for approximately $53 million over a twelve-year period in business and equipment tax reimbursements and authority for BIW to retain approximately $60 million in employment-related taxes, a matter unrelated to Article IX, Section 8. *Delogu v. State,* 1998 ME 246, ¶¶ 2–7, 720 A.2d at 1154. In the context of promoting a $597 million expansion, we held that legislative approval for the City to rebate taxes on a portion of the increased value of the real estate resulting from the expansion was not a violation of Article IX, Section 8. *Id.* ¶¶ 17–18, 720 A.2d at 1156. *Delogu* confirms that legislative authorization is a prerequisite for a municipal property tax rebate or repayment program targeting selected properties. It does not support the City of Portland's argument that it can adopt such a selective tax re-

---

in Section 12 recognition of property tax exemptions as, presumably, consistent with the nearly contemporaneous adoption of Article IX, Section 8. P.L. 1821, ch. 116, § 12. Section 57 of chapter CXVI provided explicit legislative authorization for municipalities to abate a portion of taxes, to be determined by the municipality, for prompt payment after delivery of tax bills. P.L. 1821, ch. 116, § 57.

5. ME. CONST. art. IX, § 7.

6. ME. CONST. art. IX, § 8.

7. ME. CONST. art. IX, § 8(2)(A).

payment program unilaterally, without legislative authority.

[¶ 21] The City asserts that, because the method of providing property tax relief by tax repayments is an expenditure program rather than a taxing program, it is not subject to Article IX, Section 8. Accepting the City's argument would suggest, contrary to our precedent, that the City of Bath could have unilaterally, without legislative authorization, adopted its program for tax repayments to Bath Iron Works.

[¶ 22] The Portland Property Tax Relief Program is an integral part of the Portland tax apportionment and assessment structure. The timing for the repayment applications is tied directly to the time when the City will be receiving property tax payments so "that the City will have received sufficient tax funds in FY' 04 and *subsequent tax years* to pay the tax rebates that are approved and mailed out." Portland City Council Agenda, 5/19/2003, p. 8. (Emphasis added.) In effect, the program provides an exemption or abatement to qualifying homeowners through the collection and repayment of taxes.

[¶ 23] Our precedents emphasizing the importance of legislative approval for exemptions or other deviations from the principle of equality in property taxation are derived from Article IX, Section 8. Three years before the adoption of Article IX, Section 9, we addressed the dangers inherent in municipal tax schemes involving exemptions or abatements resulting in unequal assessments or unequal apportionments of property tax burdens in *Brewer Brick Co. v. Inhabitants of Brewer*, 62 Me. 62 (1873). In *Brewer Brick*, the Town of Brewer, acting pursuant to a state law, R.S. ch. 6, § 6 (1871), allowing it the option of granting a property tax exemption for certain manufacturing facilities, had at first allowed and then withdrawn the exemption. 62 Me. at 63. Thus, the case involved legislative approval of a municipality's choice to grant an exemption, a factor that is lacking in this case.

[¶ 24] In addressing the withdrawn exemption, we cautioned that the capacity of individual towns to exempt or reduce assessments on certain favored properties could lead to inappropriate competition between various municipalities to promote the location within their borders of certain favored property owners. *Id.* at 75–76. We also expressed concern that in such schemes, "the property of the minority would be subject to the will of the majority." *Id.* at 72. We recognized that the greater amount of property values being exempted from taxation, the heavier the burden that would fall on nonexempted properties. *Id.* at 75.

[¶ 25] We held that Brewer's exemption of a particular manufacturer's properties from real estate taxes was unconstitutional and violative of Article IX, Section 8 noting that: "[I]t is for the legislature to impose taxes and to exempt from taxation." *Id.* at 74. The Brewer tax scheme was flawed because "[t]his imposition of, and this exemption from, taxation are by the town and not by the legislature." *Id.* We stated that: "To have uniformity of taxation, the imposition of, and the exemption from taxation, must be by one and the same authority—that of the legislature," *id.* at 74 and, that if each town could exempt part of the property located in the town from taxation then "uniformity in relation to the subject-matter, as well as to the ratio of taxation, is at an end," *id.* at 75.

[¶ 26] Presaging Article IX, Section 9, we held that taxation and exemption from taxation were inherently intertwined—"exemption from taxation includes the imposition of taxes," *id.* at 74—and that the Legislature could not delegate the power

to choose to tax or choose to exempt to municipalities,[8] *id.* at 74–76.

[¶ 27] In a case when Article IX, Section 9, was at issue, we stated that: "Taxation is legislative. What money shall be raised by taxation, what property shall be taxed, what exempted, rests exclusively with the Legislature to say, without any limitations, except such as are imposed by express constitutional provision." *Greaves v. Houlton Water Co.,* 143 Me. 207, 211, 59 A.2d 217, 219 (1948).

[¶ 28] *Greaves* and a later case, *Blair v. State Tax Assessor,* 485 A.2d 957 (Me. 1984) applied Article IX, Section 9 to hold that one Legislature enacting an exemption could not bar a future Legislature from limiting or withdrawing the exemption. *Blair,* 485 A.2d at 960; *Greaves,* 143 Me. at 213, 59 A.2d at 220. The discussion of legislative authorization as a prerequisite for municipal exemption has occurred mostly in the context of opinions addressing Article IX, Section 8.

[¶ 29] For tax year 2003–2004, the effect of the Portland Property Tax Relief Program is to exempt or abate $15,000 of value of each qualifying home from property taxation. This is exactly the type of unequal apportionment of municipal tax burdens without legislative authorization that Article IX, Section 8 has been interpreted to prevent and that we explicitly stated should not and could not occur in our opinion in *Brewer Brick Co.*

[¶ 30] Accordingly, we declare the Portland Property Tax Relief Program violative of Article IX, Section 8 of the Maine Constitution and the principles we have stated in interpreting Article IX, Section 8 to bar individual municipalities, without legislative authorization that meets the standards of Article IX, Section 9, from creating exemptions or abatements that result in unequal apportionments or assessments of real property taxes.

[¶ 31] Having declared the property tax relief program violative of Article IX, Section 8, and unauthorized in accordance with Article IX, Section 9, we do not proceed further to issue an injunction. Injunctions involving the assessment and collection of taxes, because they address a central and inherent function of government, should only be issued with caution and then only after an indication that a court's ruling declaring the law will not be respected.[9] We see no basis to issue such an injunction in this case. Instead, the matter will be remanded to the Superior Court for such further proceedings as may be necessary based on our declaration of law in response to the report from the Superior Court.

The entry is:

Remanded to the Superior Court for proceedings consistent with this opinion.

LEVY, J., concurring in part and dissenting in part.

[¶ 32] Although I concur with the result reached by the Court, I do not agree that the Portland Property Tax Relief Program violates Article IX, Section 8 of the Maine Constitution. I believe the Program vio-

---

8. The municipal power to choose to tax or to exempt, prohibited by our opinion in *Brewer Brick,* must be distinguished from the frequently recurring and appropriate municipal function of deciding whether a particular property qualifies for a legislatively approved exemption, such as the exemption for charitable institutions. *See* 36 M.R.S.A. § 652(1)(A).

9. In responding to the plaintiff's request to this Court for a preliminary injunction, the City indicated it had a remedy available should the tax relief program be declared invalid.

lates Article IX, Section 9, and therefore I write separately.

[¶ 33] The Court characterizes the Portland program as establishing a property tax *exemption*, as it must in order to conclude that the program results in an unequal tax apportionment in violation of Article IX, Section 8. The program, however, authorizes a tax rebate, not a tax exemption. As an expenditure of municipal revenues, the program must be presumed to be valid unless it is demonstrated to be contrary to a state or federal constitutional restriction on the City's home rule authority. *See* 30–A M.R.S.A. § 3001(2) (1996) (creating a rebuttable presumption that any ordinance enacted under a municipality's home rule authority is a valid exercise of that authority). The presumption of validity is overcome here not because the program results in an unequal assessment or apportionment of taxes in violation of Article IX, Section 8, but rather because it is an exercise of the State's power of taxation without prior legislative authorization in violation of Article IX, Section 9.

## I. ARTICLE IX, SECTION 8 OF THE MAINE CONSTITUTION

[¶ 34] The Portland program contains two components. First, it authorizes the expenditure of municipal tax revenues for the purpose of providing a rebate to certain taxpayers in order to reduce their tax burden. In both *Delogu* and *McBreairty*, we recognized that a critical distinction exists between the assessment of taxes and the spending of tax revenues:

> Although Article IX, Section 8 requires equal assessment of property taxes, it does not apply to the manner in which the government chooses to spend [its] tax revenues. There is no requirement that the Legislature distribute tax revenues equally.

*Delogu v. State*, 1998 ME 246, ¶ 18, 720 A.2d 1153, 1156 (quoting *McBreairty v. Comm'r of Admin. and Fin. Servs.*, 663 A.2d 50, 55 (Me.1995)).[10]

[¶ 35] Second, the Portland program anticipates the added expense to the City's treasury resulting from the program by adopting an across-the-board and uniform increase in the property tax mill rate of eighty-nine cents. This increase is an "apportionment" of taxes subject to the requirement of Article IX, Section 8 that "[a]ll taxes upon real and personal estate ... shall be apportioned and assessed equally according to the just value thereof." Because the Portland tax increase is uniform as to all taxable property, it is not discriminatory and satisfies the constitutional mandate of equality.

[¶ 36] The Court relies on the apparent linkage between the rebate program and the eighty-nine-cent increase in the mill rate to pay for the program in reaching its

---

10. The plaintiffs attempt to distinguish this case from the holdings in *Delogu* and *McBreairty* largely on the identity of funds involved—specifically, that a portion of the same property tax dollars being paid in are automatically being paid out to some, but not all taxpayers. This contention is unfounded. The revenues resulting from the increase in the City's mill rate are not segregated, but are instead paid into the City's general fund. Accordingly, the source of funds for the rebate program is an amalgamation of all revenue sources, including property taxes, excise taxes, revenue sharing, forfeitures, fees, etc. In addition, *Delogu* does not stand for the proposition that Article IX, Section 8 requires legislative authorization as a prerequisite for a municipal property tax rebate or repayment program targeting selected properties. In *Delogu*, we concluded that the City of Bath's tax increment financing program did not violate Article IX, Section 8 because the TIF was an expenditure of tax revenues, and not an assessment of taxes. *Delogu*, 1998 ME 246, ¶ 18, 720 A.2d at 1156. The fact that the TIF had prior legislative authorization had no bearing on this conclusion.

conclusion that the program results in an unequal apportionment of taxes. However, because the program involves an expenditure from the City's general fund to qualifying taxpayers, it does not involve the "internalization" that arises when a spending measure and a tax exemption are adopted in a single measure. Internalization occurs where a "credit or exemption defended as an independent payment measure reduces the challenged tax qua tax." Dan T. Coenen and Walter Hellerstein, *Suspect Linkage: The Interplay of State Taxing and Spending Measures in the Application of Constitutional Antidiscrimination Rules*, 95 MICH. L. REV. 2167, 2197 (1997). Internalization is not present in programs involving outright government payments. "[T]he absence of internalization in both the strong and weak senses—through reduction of the tax in question or the reduction of some other tax—substantially undercuts the case for linkage whenever the state makes outright payments of cash." *Id.* at 2215.

[¶ 37] The absence of internalization is constitutionally significant because there is, as in this case, a clear and functional barrier drawn between the spending measure and the tax increase. Portland's rebate program is funded by the City's various general fund revenue sources and relies on an annual appropriation in order to be sustained. The program must, therefore, compete with all other programs for annual budget approval. Unlike a tax exemption, the Portland program does not place in the hands of individual taxpayers the means to unilaterally reduce their tax apportionment.

[¶ 38] The Portland program does not run afoul of Article IX, Section 8, because the rebate it authorizes is an expenditure of municipal revenues and is not an exemption, and the tax increase associated with it is apportioned equally among all taxpayers.

## II. THE RELATIONSHIP BETWEEN HOME RULE AUTHORITY, ARTICLE VIII, PT. 2, § 1 AND THE POWER OF TAXATION, ARTICLE IX, § 9

[¶ 39] Article VIII, pt. 2, § 1, directs the Legislature to prescribe the procedure by which municipalities exercise their home rule authority.[11] In *School Committee of Town of York v. Town of York*, 626 A.2d 935 (Me.1993), we held that the enabling legislation enacted to implement this provision, currently codified at 30–A M.R.S.A. § 3001 (1996), "convey[ed] a plenary grant of the state's police power to municipalities, subject only to express or implied limitations," 626 A.2d at 938, contained in the state and federal constitutions, *id.* at 939.

[¶ 40] Article IX, Section 9 provides an express limitation on the plenary grant of home rule authority to municipal governments: "The legislature shall never, in any manner, suspend or surrender the power of taxation." We have construed this language as creating a " 'strong and sweeping prohibition' against delegation of the legislature's power to tax." *Me. Milk Producers, Inc. v. Comm'r of Agric.*, 483 A.2d 1213, 1220 n. 11 (Me.1984) (quoting *Boston Milk Producers, Inc. v. Halperin*, 446 A.2d 33, 40 (Me.1982)). The question presented here is whether the power to tax includes

11. Article VIII of the Maine Constitution states:

The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character. The Legislature shall prescribe the procedure by which the municipality may so act.

ME. CONST. art. VIII, pt. 2, § 1.

the establishment of a program, such as Portland's, that provides for direct payments to individual taxpayers for the purpose of reducing their tax burden. I conclude that it does.

[¶ 41] The sovereign's power of taxation has various attributes, among them the establishment of a process for obtaining the abatement of taxes. This is reflected in the Maine Tax Code, which provides for the abatement of taxes based on errors or mistakes in assessments and the infirmity or poverty of the taxpayer. 36 M.R.S.A. § 841(1), (2) (1990 & Supp.2003). An individual may apply for an abatement based on an error or mistake "within one year from commitment" so that, in some instances, an abatement may be sought and obtained after the tax has been paid. *Id.* § 841(1). When a taxpayer receives an abatement of taxes after having paid a tax assessment, the abatement takes the form of a *rebate*. A rebate is "[a] return of part of a payment, serving as a discount or reduction." BLACK'S LAW DICTIONARY 1273 (7th ed.1999).

[¶ 42] Regardless of whether one characterizes a payment made pursuant to the Portland program as an abatement or a rebate, the result is the same: the City makes a direct payment so as to effectively reduce the recipient's tax burden. This is precisely what was intended through the enactment of the program: "The purpose of this program is to provide property tax relief to Portland homeowners." Portland, Me., Code ch. 2, § 2–430. Although, for the reasons previously discussed, the Portland program payments do not constitute a tax exemption subject to scrutiny under Article IX, Section 8, they do constitute an abatement of taxes subject to the nondelegation mandate of Article IX, Section 9.

[¶ 43] Article IX, Section 9 is unequivocal: "The Legislature shall never, in any manner, suspend or surrender the power

of taxation." Because the creation of a tax abatement arises from the power to tax, approval by the Maine Legislature is required before a municipality may create and implement a tax abatement program. In view of the "strong and sweeping" constitutional proscription contained in Article IX, Section 9, I conclude that Portland exceeded its home rule authority by adopting the program without prior legislative authorization.