DECISION
In Re: Cases consolidated for pretrial management pursuant to Administrative Order 94-15
These cases come before this Court on the motions of certain of the defendants, referred to as "the hierarchical defendants," to dismiss certain of the claims asserted by the plaintiffs on the ground that the Court lacks subject matter jurisdiction.[1]
The question presented is whether or not the religious liberties guaranteed by the First Amendment, as incorporated into the Fourteenth Amendment, will be violated, if the Court exercises its common law jurisdiction to impose a duty on the hierarchical defendants to exercise due care in the assignment, supervision and control of their religious subordinates.
The plaintiffs claim that they were sexually molested as children by Roman Catholic priests in the Diocese of Providence. The defendants are Roman Catholic bishops and others who are alleged to have had some religious authority to exercise supervision over the priests. The present procedural posture of these cases defies ready summary, but the parties and the Court agree that these motions are ripe for decision.
The pertinent claims are found in a "Proposed Amended Complaint," filed by the plaintiffs in Heroux, et al. v.Gelineau, et al., C.A. No. PC 92-5807, to which reference may be had for summary and analysis as a model statement of claims for all plaintiffs. The motion is specifically addressed to Count III, as well as to Counts I, II, V, VI, IX, X, XI and XVIII, as "related" Counts.
The plaintiffs allege in Count III that the hierarchical defendants knew that certain priests, alleged to be under their control and supervision, were a risk of sexual molestation to children, including the plaintiffs, with whom they might come in contact. Paragraph 6 of that Count sets out what the plaintiffs claim to be the negligent conduct of these defendants. They allege that these defendants "negligently screened, selected, trained, retained, employed, assigned, transferred and/or appointed" such risky priests to positions "in direct contact with youth." They also allege that these defendants: "negligently failed to provide and/or ensure reasonable supervision" of the priests; "negligently failed or refused to remove or suspend (such a priest) from his duties at his various assignments or appointments or as priest, or otherwise act to prevent (such a priest) from pursuing his sexual assaults on children, including the plaintiff and to require him to report same to his victims, and otherwise failed to adopt and establish policies, guidelines, or other means protecting plaintiff from a priest's propensity for deviant sexual behavior or the behavior itself." The plaintiffs conclude, of course, that this negligent conduct was the proximate cause of their injury for which they are entitled to damages.
Counts I and II allege that the conduct described in Count III was engaged in by these defendants intentionally.
Count V alleges in essence that the presence of these priests was a known risk to children on the premises where these priests carried out their priestly assignments. These hierarchical defendants are charged with negligent failure to keep premises under their control reasonably safe for use by the plaintiffs. Presumably, the premises would have been rendered safe by the removal of the unsafe condition, the priests.
Count VI alleges that the conduct of these defendants which the plaintiffs allege to have been the proximate cause of their injury was part of a conspiracy to conceal the conduct of the priests.
Count IX merely adds emotional distress to the injuries alleged by the plaintiffs.
Count X alleges that the conduct of these defendants breached a special duty to children such as the plaintiffs arising of the standing of these defendants in loco parentis, in addition to and apart from any duty of due care arising out of the common law. They allege that the offending priests were "under the direct supervision, employ and control of (these defendants)" and that the perpetrator priests "engaged in and/or was enabled by his power and position to engage in sexual molestation perpetrated against (the plaintiff)."
Count XI alleges that the conduct of defendants, generally, was an invasion of the plaintiffs' privacy in violation of G.L. § 9-1-28.1.
Count XVIII adds a claim for damages for loss of parental and filial consortium proximately caused by the conduct of these defendants.
The hierarchical defendants argue that their power or capacity to exercise any supervision or control over any behavior or conduct of their priests, including the sexual molestation of children, is derived from and itself controlled by the dictates of their religious faith. They conclude that because their power to exercise supervisory control over their subordinates, by duty assignment, by counsel, or by discipline, including removal from religious powers and duties, is derived exclusively from their religion and its doctrines and the rules governing their relationship, this Court would violate the religious autonomy of the Roman Catholic Church protected by the First Amendment if it imposed a duty of care based on that relationship.
The hierarchical defendants have framed a very narrow, but far-reaching First Amendment argument. They rely on neither the "Free Exercise" nor the "Establishment" clauses, separately, for their assertion that the Court lacks jurisdiction. They argue that the First Amendment, through these two clauses, protects the liberty of a hierarchical religion to regulate its internal affairs free of intrusion by civil government. They contend that, if this Court were to impose due care standards on the regulation and supervision of Roman Catholic priests by their bishops, it would be exercising unconstitutional control of the strictly internal affairs of their church, a clearly hierarchical religious body. The basis for their argument is asserted in their memorandum to be a "Religious Autonomy Doctrine."
Although it was not expressly denominated as such, they find the Doctrine described in Serbian Eastern Orthodox Diocese forthe United States of America and Canada v. Milivojevich,426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) and Kedroff v. St.Nicholas Cathedral of Russian Orthodox Church in North America,344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).
In Kedroff the U.S. Supreme Court decided that a New York statute offended First Amendment protection of freedom of religion, because it purported to grant one religious body control over the American branch of their church and to take that branch away from the control of another governing body in Russia. The Court held:
 "This legislation, Art. 5-C, in the view of the Court of Appeals, gave the use of the churches to the Russian Church in America on the theory that this church would most faithfully carry out the purposes of the religious trust. Thus dangers of political use of church pulpits would be minimized. Legislative power to punish subversive action cannot be doubted. If such action should be actually attempted by a cleric, neither his robe nor his pulpit would be a defense. But in this case no problem of punishment for the violation of law arises. There is no charge of subversive or hostile action by any ecclesiastic. Here there is a transfer by statute of control over churches. This violates our rule of separation between church and state." (Emphasis supplied). 344 U.S., at 109-10, 73 S.Ct., at 151, 97 L.Ed., at ____.
To buttress its conclusion that the statute violated First Amendment protection the Court referred to its constitutionalized Opinion in Watson v. Jones, 13 Wall. 679, 20 L.Ed. 666 (18):
 "The opinion (in Watson) radiates, however, a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." 344 U.S., at 116, 73 S.Ct., at 154-55, 97 L.Ed., at
It is clear from the penultimate paragraph of the Opinion of the Court in Kedroff that it was not announcing a new First Amendment doctrine, but that it was simply applying well established constitutional law under the Free Exercise Clause:
 "Ours is a government which by the `law of its being' allows no statute, state or national, that prohibits the free exercise of religion. There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition or use of property. Even in those cases when the property right follows as an incident from decisions of the church custom or law on ecclesiastical issues, the church rule controls. This under our Constitution necessarily follows in order that there may be free exercise of religion." (Emphasis supplied). 344 U.S., at 120-21, 73 S.Ct., at 156-57, 97 L.Ed., at
In Milivojevich the U.S. Supreme Court held that the Illinois Supreme Court had improperly decided which of two claimants to the office of bishop in control of church property was entitled to hold that office. Although one of the claimants had been appointed to that office by appropriate church authorities, the Illinois Supreme Court had found that the removal of the other claimant had been arbitrary and otherwise in violation of appropriate church law. The U.S. Supreme Court pointed out:
 "Resolution of the religious disputes at issue here affects the control of church property in addition to the structure and administration of the American-Canadian Diocese. This is because the Diocesan Bishop controls respondent Monastery of St. Sava and is the principal officer of the respondent property-holding corporations. Resolution of the religious dispute over Dionisijie's defrockment therefore determines control of the property. Thus, this case essentially involves not a church property dispute, but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil tribunals. Even when rival church factions seek resolution of a church property dispute in the civil courts there is substantial danger that the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs. Because of this danger, `the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.' Presbyterian Church v. Hill Church, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969)." 426 U.S., at 709, 96 S.Ct., at 2380, 49 L.Ed.2d, at _____.
Concluding, the U.S. Supreme Court held:
 "In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." 426 U.S., at 724-25, 96 S.Ct., at 2387-88, 49 L.Ed.2d, at ____.
From this First Amendment permission "to establish their own rules and regulations for internal discipline and government" these defendants argue that there is a doctrine of religious autonomy for hierarchical religions which have such rules and regulations for the discipline and government of the religious hierarchy. That doctrine, they say, bars this Court from assessing liability against hierarchical superiors for any failure to administer internal relationships in a satisfactory secular manner.
Their position has been recognized in the appellate courts of other jurisdictions.
In Swanson v. Roman Catholic Bishop of Portland, 692 A.2d 441
(Me. 1997) the plaintiffs, husband and wife, were counseled by a priest in the Portland Diocese, who had sexual relations with the wife. Among their other claims the plaintiffs asserted that the Roman Catholic Church had negligently selected, trained and supervised the priest. The trial court dismissed the plaintiffs' claims of negligent selection and training, but permitted the negligent supervision claim to proceed. Because the question involved the jurisdiction of the court and was a matter of great public importance, the Supreme Court allowed an interlocutory appeal. The plaintiffs argued there, as here, that their claim for negligent supervision against the church could be resolved by the application of neutral tort principles.
The Maine Supreme Court first held that a duty to supervise arises out of an agency relationship between the supervisor and the party supervised. The court said:
 "When a civil court undertakes to compare the relationship between a religious institution and its clergy with the agency relationship of the business world, secular duties are necessarily introduced into the ecclesiastical relationship and the risk of constitutional violation is evident. The exploration of the ecclesiastical relationship is itself problematic. To determine the existence of an agency relationship based on actual authority, the trial court will most likely have to examine church doctrine governing the church's authority over (the Priest)." 692 A.2d, at 444.
The Maine court recognized that other courts had held that an agency relationship between a priest and his hierarchical superiors could be made out without reference to questions of church law. Even assuming that to be so, it held nonetheless that the imposition of secular duties and liabilities on the church as if it were a principal would infringe upon its right to determine the standards governing the relationship between the church, its bishops and its priests. That court decided:
 "To import agency principles wholesale into church governance and to impose liability for any deviation from the secular standard is to impair the free exercise of religion and to control denominational governance. Pastoral supervision is an ecclesiastical prerogative." Id., at 445.
Finally, the court also recognized that some courts have permitted claims to proceed where a plaintiff, as here, has alleged that the church knew that the offending priest was dangerous. It felt that those courts had failed "to maintain the appropriate degree of neutrality required by the United States and Maine Constitutions." Id.
Two justices dissented on the ground that the appeal was considered prematurely. They felt the court had acted prematurely in ruling out the possibility of a claim for harm where the church knew of the risk from the priest but did nothing to protect prospective adult victims. The dissenters suggested that there might have been a different result if the victims had been minors.
In Mulinix v. Mulinix, 1997 WL 585775 (Minn. App.) (Unpublished) the Minnesota Court of Appeals held that claims against the Wisconsin Evangelical Lutheran Synod, one of its subdivision, and a local Lutheran church for negligent retention and supervision of the plaintiff's husband, a Lutheran pastor, was barred by the First Amendment. Adjudication of these claims, said the court, would necessitate inquiries into the church's motive for not discharging the husband, as well as how the church investigates and resolves complaints concerning clergy misconduct. According to the court these claims involved ecclesiastical concerns. The court did acknowledge that if the dispute could have been resolved solely by the application of neutral principles of law, courts could take jurisdiction.
Recently the Supreme Court of Missouri held that the First Amendment bars civil actions against the Diocese of Kansas City — St. Joseph for negligence in hiring, ordaining, retaining and supervising a Roman Catholic priest alleged to have sexually molested a minor plaintiff. Gibson v. Brewer, 952 S.W.2d 239 (Mo. 1997). The Missouri court held that questions of hiring, ordaining, and retaining clergy necessarily involve interpretation of religious doctrine, policy and administration. The court characterized such interpretation as excessive entanglement between church and states, which would have the effect of inhibiting religion in violation of the First Amendment. It also held that such inquiry would also result in a forbidden endorsement of one form of religion by approving one model for church hiring, ordination and retention of clergy.
The issue of negligent supervision of the priest after the diocese was alleged to have had knowledge of his sexual misconduct and a propensity to continue that conduct presented a somewhat different matter calling for a somewhat different analysis. The court held that negligent supervision implicates the duty of a master to control the conduct of a servant, as set out in Restatement of Torts (Second), § 317 (1965). Since the master's liability depends on knowledge, or a duty to know, of the necessity and opportunity for exercising such control, adjudicating the reasonableness of a church's supervision of a cleric, said the court, — what the church should know — requires inquiry into religious doctrine, which creates a forbidden excessive entanglement, inhibition of religion and endorsement of a particular model of religious practice. The court recognized that there were cases holding otherwise but it did not find them persuasive.
The court did, however, allow claims for intentional failure to supervise clergy. As to such a claim the court said:
 "A cause of action for intentional failure to supervise clergy is stated if (1) a supervisor (or supervisors) exists[,] (2) the supervisor (or supervisors) knew that harm was certain or substantially certain to result, (3) the supervisor (or supervisors) disregarded this known risk, (4) the supervisor's inaction caused damage, and (5) the other [?] requirements of the Restatement (Second) of Torts, section 317 are met. The cause of action requires a supervisor. The First Amendment does not, however, allow a court to decide issues of church government — whether or not a cleric should have a supervisor." 952 S.W.2d, at 248.
The Wisconsin Supreme Court considered an argument that the plaintiff's claim against the Roman Catholic Diocese of Madison, Inc. for negligent supervision of one of its priests could be determined by the application of neutral principles of law inL.L.N. v. Clauder, 563 N.W.2d 434 (Wis. 1997). The trial court had granted a motion for summary judgment for the diocesan defendant on a negligent supervision claim. The intermediate appellate court reversed in a decision cited by the plaintiffs here. The supreme court reversed the court of appeals and ordered judgment for the defendant on this claim. The court reaffirmed its earlier holding in Pritzlaff v. Archdiocese of Milwaukee,194 Wis.2d 302, 533 N.W.2d 780 (1995) that the First Amendment bars claims for negligently hiring, retaining, training and supervising a priest, because exercising jurisdiction over such claims would require a forbidden inquiry into church laws, practices, and policies. The plaintiff in L.L.N. argued that her case was different from Pritzlaff because in her case the diocesan defendant had notice of the alleged perpetrator's propensity for sexual misconduct and failed to take reasonable action to protect her. The court held that in that case it would not be able to apply solely neutral principles of law to determine whether the diocese had constructive notice of the earlier alleged sexually offensive incident, which is required by the First Amendment.
The plaintiffs urge the court to consider a different First Amendment analysis. They argue that the U.S. Supreme Court cases cited by the defendants propound no special doctrine of religious autonomy of general application to tort claims against religious bodies. They claim that those cases are simply straightforward applications of the Free Exercise Clause to church property and church organization claims. They agree that, if an asserted claim cannot be at all adjudicated without reference to church regulation, policy and doctrine, the First Amendment forecloses jurisdiction. A different approach is required, they say, when the conduct of church authorities is challenged as a violation of tort law.
The controlling principles for decision are to be found most recently discussed in Employment Division, Department of HumanResources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876, reh. den. 496 U.S. 913, 110 S.Ct. 2605, 110 L.Ed.2d 285 (1990). The question presented in that case was whether the State of Oregon could constitutionally condition Smith's entitlement to unemployment compensation benefits on his foregoing the ingestion of peyote for sacramental purposes at a ceremony of the Native American Church, of which he was a member. The court said that it had "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." 494 U.S., at 878-79, 110 S.Ct., at 1600, 108 L.Ed.2d, at 885. The court further held that the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes). Id.
The award of damages for a negligent failure to supervise the conduct of his priests by the bishop is no more than an application, they say, of a valid and neutral law of general applicability." It is valid because the State may apply common law tort doctrine to the conduct of anyone within its jurisdiction. It is neutral because on its face it has nothing to do with the religious beliefs or practises of any individual. It is of general application because it applies to anyone in a position to exercise control over the behavior of another who has knowledge of the risk of harm that other presents to third parties.
The plaintiffs argue that the hierarchical defendants knew about the predisposition of the perpetrator priests to molest children sexually and further knew that unless these priests were denied access to children they would continue their molesting behavior. In spite of that knowledge of the risk these priests constituted, according to the plaintiffs, the hierarchical defendants concealed that predisposition and continued to assign such priests to positions where they were able to continue their harmful behavior to the injury of these plaintiffs. The plaintiffs say that it is for such conduct of the hierarchical defendants that they seek damages, whether that conduct is prescribed or proscribed by the religious beliefs of the defendants or the doctrines and policies of their church.
The plaintiffs have shown the Court the learned and exhaustive memorandum and order of Judge Torres in Smith v.O'Connell, U.S.D.C.R.I., C.A. No. 93-615-T, November 25, 1997, on the very questions presented here. In that case the court rejected the hierarchical defendants' argument that the so-called religious autonomy doctrine extended beyond the protection of the internal affairs of a religious body. The court chose to apply current Free Exercise Clause law to the questions, regarding the plaintiffs' claims as tort claims for negligent or intentional failures to prevent foreseeable injury to the plaintiffs. He perceived a legal duty to protect the plaintiffs from injury by the perpetrator priests. Smith v. O'Connell, supra, Memorandum and Order, p. 9.
He relied on Welsh Mfg., Div. of Textron, Inc. v.Pinkerton's, Inc., 474 A.2d 436 (R.I. 1984) for the proposition that Rhode Island law will hold an employer liable for the misconduct of an employee attributable to the employer's negligent failure to supervise the employee. The principle underlying that rule is neutral and of general application. What is, of course, critical to Judge Torres' rationale is the unarticulated assumption that the principle is not limited to an employment relationship and can be extended to the bishop-priest relationship without inquiry into church doctrine.
The defendants argue that unlike the run-of-the-mill employer-employee relationship, which is defined by common law contract and agency principles, the bishop-priest relationship is defined exclusively by religious doctrine. Accordingly, they say, the court cannot decide whether to apply Welsh negligence principles to the clerical relationship between the defendants and their priests. Without addressing church rules, doctrines and policies to define and describe that relationship, the bishops become no more than knowledgeable bystanders, as to whom the common law assigns no duty of reasonable care to prevent injury to third parties. The plaintiffs argue that the bishops in fact do have a supervisory relationship to their priests, which can be proved without adverting to matters of internal church governance. They say that the source of the hierarchical defendants' authority to exercise control over the perpetrator priests is immaterial. What is material to their claim of negligent supervision is the fact that the hierarchical defendants do have the capacity to control the access of priests to children, who are potential victims of the propensity of these priests to engage in sexually assaultive conduct. There is no need, they argue, and Judge Torres agrees, to inquire into the source, nature and extent of that authority. Once that authority is shown by religiously neutral evidence, combined with religiously neutral evidence of pertinent knowledge on the part of these defendants, neutral common law tort rules can be applied to determine liability for failure to exercise due care to protect foreseeable victims from the known risk under their control. Because of the facts of knowledge and control, the hierarchical defendants are no longer like knowledgeable bystanders, but are more like common law employers.
The defendants nonetheless contend that even if the capacity of the hierarchical defendants to exercise supervisory control over their priests could be proved by evidence derived without examination of church rules, policies and doctrines, the religious standards pertaining to the manner of exercising that supervisory control may conflict with the common law rules. The plaintiffs contend that the neutrality and general application of the common law rule overcome any free exercise obstacle. See Smith, supra.
This Court is satisfied that in order for it to determine whether or not the relation between a bishop and his priests is sufficiently agent-like to give rise to a common law duty to exercise reasonable care in the exercise of whatever supervisory authority the bishop has the Court is required to examine and analyze the rules, policies and doctrine of the Roman Catholic Church. That examination and analysis is prohibited by the First Amendment. The same prohibition will prevent this Court from analyzing those rules, doctrines and policies of the Roman Catholic religion to determine what the hierarchical defendants should have known, as distinguished from what they actually knew.
The Court has read the affidavits of Louis E. Gelineau and Francis G. Morrissey with great care and interest. The application of the substance of those affidavits to the issue presented by these motions would involve this Court in the very inquiries prohibited to it by the First Amendment. For the purposes of ruling on this motion the Court has assumed that the substantial allegations contained in paragraphs 1 through 9, inclusive, of Part I, The Parties, B. Hierarchy Defendants, of the plaintiffs' Proposed Amended Complaints are generally true, without consideration of any implicit confirmation or denial of those allegations in the affidavits. Those allegations clearly show that the relation between the hierarchical defendants and the perpetrator priests is entirely created and defined by the tenets of the Roman Catholic religion.
This Court concludes from its analysis of the authorities submitted by the parties and their enlightening and cogent written and oral arguments that this Court lacks jurisdiction to adjudicate claims that the hierarchical defendant negligently hired, retained, disciplined or counseled their subordinate priests. Inquiry into such matters would plainly take this Court into religious questions beyond its jurisdiction. Claims arising out of allegations of negligent supervision based on what the hierarchical defendants should have known, as distinguished from what they in fact knew, proved directly or circumstantially, require the same invasion into religious rules and policy. Negligence based on a failure to train clergy or to develop appropriate policies for dealing with allegedly molesting priests cannot be the subject of the Court's jurisdiction for the same reasons. It does not matter whether the legal theory under which the claims are brought is ordinary negligence, premises liability, breach of fiduciary relations, misrepresentation by concealment, or breach of parental responsibility by one in locoParentis. So long as the asserted cause of the injury alleged to be compensable by damages is a failure merely to exercise reasonable care to control the conduct of a religious subordinate, this Court will lack jurisdiction to adjudicate the claim.
Having said all that, and having so defined the parameters of this Court's jurisdiction, the Court is impressed by the extension of the duty of reasonable care imposed on a master for the off-duty intentional misconduct of a servant in Section 317 of the Restatement of Torts, (Second), announced by the Missouri Supreme Court in Gibson v. Brewer, supra. "Recognizing the tort of intentional failure to supervise clergy * * * does not offend the First Amendment." (Emphasis supplied). Id., 952 S.W.2d, at 248. To the extent the plaintiffs' claims assert that the failure of the hierarchical defendants to prevent harm from coming to these children at the hands of the perpetrator priests was a knowing and deliberate course of conduct, this Court can, nay must exercise its common law jurisdiction to protect the interests of children within its jurisdiction.
The Court is aware that the various Counts of the "Proposed Amended Complaint" are not as plain as they could be in their statement of the facts upon which each claim is based. A fair reading, nevertheless, of the complaint, taken as a whole (including even Count III, which purports to assert a pure negligence claim), does demonstrate claims under various theories that the hierarchical defendants knowingly placed dangerous priests in positions where innocent child victims might encounter that known danger. The Court is also aware of the problems of proof which may be encountered as the plaintiffs try to develop their cases based on a theory of intentional failure to supervise clergy to prevent harm to children. Those problems must wait to later pretrial stages, and, perhaps, even to the trial itself.
The motion of the hierarchical defendants is granted with respect to claims based on an alleged negligence in the hiring, training, disciplining and retaining of the perpetrator priests.
The motion is also granted with respect to claims based on an alleged mere negligence in the supervision and control of the off-duty behavior of the perpetrator priests.
The motion is denied with respect to claims based on an alleged intentional failure to supervise and control the perpetrator priests in order to protect the safety of and prevent injury to children with whom such priests may have contact.
The parties will submit a form of order on reasonable notice to each other.
[1] Because of an inadvertent omission of notice of hearing on this motion to counsel for the plaintiff in Mary Ryan, et al. v.Roman Catholic Bishop of Providence, et als., C.A. No. PC 95-6524, this decision and any order(s) entered pursuant thereto will not be binding on the plaintiffs in that case. Those plaintiffs will be afforded an opportunity to be heard, if they request one.