1999 ME 49

CITY OF BIDDEFORD

v.

Patricia P. ADAMS et al.

Supreme Judicial Court of Maine.

Argued Jan. 7, 1999.

Decided March 15, 1999.

Harry B. Center, II (orally), Smith Elliott Smith & Garmey, P.A., Saco, for plaintiff.

Sally J. Daggett (orally), William H. Dale, Jensen Baird Gardner & Henry, Portland, for defendants.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] The City of Biddeford appeals from the judgment of the Superior Court (York County, *Brennan*, J.) affirming the decision of the State Board of Property Tax Review granting multiple taxpayers abatements on their 1993 and 1995 property taxes. Biddeford argues the Board erred in finding unjust discrimination in the assessment of the taxpayers' taxes. Biddeford also contends that the abatements ordered by the Board are erroneous because they do not directly relate to the unjust discrimination. We affirm the decision of the Board.

[¶ 2] Patricia Adams and the other seventy-six plaintiffs are taxpayers who own single family residences in the Biddeford neighborhood known as Granite Point. In 1990, Biddeford conducted a revaluation of all properties for tax assessment purposes. As part of the process, the coastal areas were divided into four neighborhoods: Biddeford Pool, Hills Beach, Granite Point, and Fortunes Rocks. Each of the neighborhoods was assigned a neighborhood factor which was used in the formula to determine the property valuation and reflected the desirability of the neighborhood. Four other factors were also

used in the formula to determine value: (1) land area (median lot size); (2) site index factor (proximity to ocean); (3) condition factor (individual characteristics of the lot, such as views and topography); and (4) unit price.

[¶ 3] The assessment was updated in 1993 because of the declining real estate market. The update resulted in an average reduction of 5 to 6% in the valuations due to a decrease in the site index factor for both Granite Point and Fortunes Rocks for the April 1, 1993 assessment date. Fortunes Rocks, however, also received an additional 12.5% reduction in the neighborhood factor that Granite Point did not receive. Biddeford's assessor stated that the added decrease was the result of differences between the neighborhoods and that, unlike Fortunes Rocks, there had been no sales in Granite Point from which to develop an adjustment. He also stated that he granted the 12.5% decrease based on his "gut feeling." Biddeford made the same assessments for 1995 that it had for 1993.

[¶ 4] Seventy-six taxpayers who owned Granite Point properties sought tax abatements challenging their 1993 assessments. After the assessor denied the abatements, and the City Board of Assessment Review declined to act upon the appeals within sixty days, the taxpayers appealed to the State Board of Property Tax Review. *See* 36 M.R.S.A. § 843(1) (Supp.1998) (providing for appeal to State Board where local board fails to act within sixty days). The Board voted three to one to affirm the assessor's actions.

[¶ 5] The taxpayers appealed that decision to the Superior Court, arguing that one of the board members made an impermissible site visit after the close of evidence but before deliberations. After concluding that the board member acted improperly, the Superior Court *(Fritzsche, J.)* remanded the case to the Board for a new hearing before a different panel.

[¶ 6] Meanwhile, seventy-seven taxpayers who owned Granite Point properties sought abatements on their 1995 assessments, which the assessor denied, and the City Board of Assessment Review refused to consider. After a timely appeal to the State Board, the parties agreed to consolidate the remand of

the appeals on the 1993 assessments with the appeals of the 1995 assessments. *See* 36 M.R.S.A. § 849 (1990) (providing for consolidation of appeals). The taxpayers argued that their properties were substantially overvalued and that they had been subjected to unjust discrimination. After finding that Biddeford unjustly discriminated against the taxpayers, the Board voted unanimously to grant the abatements. Biddeford appealed to the Superior Court pursuant to M.R. Civ. P. 80C, and the abatements were affirmed.

I.   Remand for Improper Conduct
of Board Member

[¶ 7] Biddeford first contends that the Superior Court erred by granting the taxpayers a new hearing before the Board with respect to the appeals of the 1993 assessments. One of the board members visited the neighborhoods at issue after the Board finished taking evidence but before it began deliberations. The parties were not notified that the board member was going to visit the neighborhoods, nor did they have an opportunity to comment on the visit, to accompany the board member, or even ascertain that the board member was, in fact, visiting the neighborhoods that he thought he was visiting.

[¶ 8] "When the Superior Court ... reviews an administrative agency decision without developing any additional evidence beyond the record before the agency, we review the administrative record directly for an abuse of discretion, error of law, or findings unsupported by substantial evidence on the record." *H.E. Sargent, Inc. v. Town of Wells*, 676 A.2d 920, 923 (Me.1996). Here, the Superior Court, without taking additional evidence and on the record of the first Board hearing, remanded the matter to the Board for a de novo hearing. We have reviewed the record of the first hearing, and we conclude that the Board exceeded the bounds of its discretion by proceeding to a decision without taking substantial steps to cure the improper conduct of the board member.

[¶ 9] "It is essential to a party's right to procedural due process that he be given notice of and an opportunity to be

heard at proceedings in which his property rights are at stake." *Mutton Hill Estates v. Town of Oakland,* 468 A.2d 989, 992 (Me. 1983). Because no notice was given to the parties of the site visit, they could not be present during the visit or provide a response to the evidence gathered from the visit.[1] For this reason, the visit was improper.

[¶ 10] Furthermore, only evidence that is made a part of the record can be considered by the Board in making its decision. *See* 5 M.R.S.A. § 9059(4) (1989). An agency cannot use information that is not of record. "The purpose of this rule is to give a party the opportunity to explain adverse evidence." *Brooking v. Maine Employment Sec. Comm'n,* 449 A.2d 1116, 1119 n. 4 (Me. 1982). To the extent that an agency relies on information obtained outside of the record and the proceedings, it has acted improperly.

[¶ 11] We are unable to conclude from this record that the visit was harmless. A critical disputed fact at the hearing, as well as the later hearing on remand, was whether the Granite Point neighborhood differed from the Fortunes Rocks neighborhood. In its first decision the Board concluded that the assessor was not required to make the same adjustment to the assessments of the Granite Point properties as it had for those in Fortunes Rocks because they were not identical neighborhoods. The board member who visited the neighborhoods was adamant in expressing the viewpoint that the neighborhoods were different. The record of the Board's deliberations demonstrates that the visit to the neighborhoods was a factor in the member's decision. The Board consisted of four members, and the vote to deny the abatement was three to one with one member voting in the majority for the express reason of avoiding a tie.

[¶ 12] The Board chairman recognized that the visit by the board member without notice to the parties and after the evidence had closed was improper. Nonetheless the only curative step taken was to caution the member not to let the visit influence his vote.[2] Because the improper behavior of the board member was not harmless, the Board abused its discretion in not taking a substantial step to cure the improper conduct, and the remand by the Superior Court was not erroneous.

## II. Finding of Unjust Discrimination

[¶ 13] Biddeford next argues there was insufficient evidence to support a finding of unjust discrimination for either the 1993 or 1995 assessment. A town's assessment is presumed valid and the taxpayer must prove it is manifestly wrong. *See IBM Credit Corp. v. City of Bath,* 665 A.2d 663, 664 (Me.1995). To show that an assessment was manifestly wrong, the taxpayer must prove that the property is substantially overvalued, there was unjust discrimination, or that the assessment was fraudulent. *See Chase v. Town of Machiasport,* 1998 ME 260, ¶ 12, 721 A.2d 636, 640. At the second hearing, the Board concluded the taxpayers failed to prove substantial overvaluation, but found they proved unjust discrimination in both the 1993 and 1995 tax assessments.

[¶ 14] Article 9, section 8 of the Maine Constitution requires that "[a]ll taxes upon real and personal estate ... shall be apportioned and assessed equally, according to the just value thereof." The assessment must represent the owner's equal portion of the burden of taxation. *See Town of Sanford v. J & N Sanford Trust,* 1997 ME 97, ¶ 13, 694 A.2d 456, 459. Taxpayers can prove discrimination only if they show that the assessor's system necessarily results in unequal apportionment.[3] *See Moser v. Town of Phippsburg,* 553 A.2d 1249, 1250 (Me.1989).

---

1. Even when an administrative board takes official notice of "general technical or scientific matters within their specialized knowledge," the parties to the adjudicative hearing are entitled to "an opportunity to contest the substance or materiality of the facts noticed." 5 M.R.S.A. § 9058(1) (1989).

2. The Board could have taken the curative step of reopening the evidence and having all members view the site after notice to the parties. *See Committee for Washington's Riverfront Parks v. Thompson,* 451 A.2d 1177, 1182 (D.C.1982).

3. This standard was established in *Moser v. Town of Phippsburg,* 553 A.2d 1249, 1250 (Me.1989) *to* modify the decision in *Farrelly v. Inhabitants of the Town of Deer Isle,* 407 A.2d 302, 307 (Me. 1979), which originally required only that the assessment have a necessary potential for dis-

[¶ 15] We conclude that there is sufficient evidence to support the Board's decision that there was unjust discrimination in the 1993 and 1995 assessments. The Board identified several factors that convinced it discrimination had occurred.

[¶ 16] First, it considered the manner in which median lot size was determined. The acreage of the Rachel Carson Wildlife Preserve, a marshlands preserve bordering on Granite Point, was included in the calculation of the median lot size for Granite Point, but similar marshlands were not included in figuring the median lot size for Fortunes Rocks. The consultant who was hired by Biddeford to do the 1990 revaluation testified that if the Rachel Carson land had been omitted from the Granite Point lot size calculation, the median lot sizes of Granite Point and Fortunes Rocks would have been very close. One of the reasons given by Biddeford to justify its assertion that Granite Point was a more desirable neighborhood than Fortunes Rocks was the larger median lot size. The Board found that the method of determining that the median lot size in Granite Point was larger than Fortunes Rocks was "arbitrary and places in question the process of establishment of coastal neighborhoods."

[¶ 17] Second, the Board found that all of the coastal neighborhoods, except Hills Beach, were homogeneous. It concluded, therefore, that the downward adjustment in values that had been made for Fortunes Rocks also should have been made for Granite Point. The Board relied upon the testimony of a real estate agent that potential buyers will not pay a premium to live in Granite Point as opposed to Fortunes Rocks, and that the two areas had the same market history in the previous five years. When updating the 1993 assessments, Biddeford reduced the neighborhood factor by 12.5% for Fortunes Rocks but not for Granite Point. Biddeford used five sales in Fortunes Rocks to justify this reduction in its neighborhood factor, but refused to apply them to Granite Point. The Board noted that the decision to reduce the neighborhood factor based on the assessor's "gut feel" was arbitrary.

[¶ 18] Third, the Board found that Biddeford changed the neighborhood code for Granite Point to that of Biddeford Pool and then used two sales in Biddeford Pool, one for more than assessed value and one for less, to justify denying a reduction in the assessments for Granite Point. Within a two year period thereafter it changed Granite Point back to a separate neighborhood code. This, the Board concluded, was arbitrary and "indicative of changing numbers to suit a situation at the time it happens."

[¶ 19] For these reasons, the Board found that Biddeford unjustly discriminated against the Granite Point taxpayers because they were treated differently than other taxpayers in Biddeford for the tax years 1993 and 1995. This conclusion was not erroneous and was supported by sufficient evidence. The record supports the conclusion that the taxpayers met their burden of proving that the Granite Point assessments were manifestly wrong because Biddeford's method necessarily discriminated against their neighborhood.

[¶ 20] Biddeford alternatively challenges the finding of unjust discrimination by contending the taxpayers failed to present credible affirmative evidence of the just value of each property at issue. It points to the Board's conclusion that the taxpayers did not show substantial overvaluation for this very reason, and it asserts that the proof must be the same for unjust discrimination.

[¶ 21] Biddeford is correct that the taxpayers presented no evidence as to the values of their individual properties. Instead, their expert appraiser performed an appraisal of fifteen Granite Point properties. The appraiser testified about the manner of choosing the fifteen sample properties and the methods he utilized in performing the appraisals, including inspecting all of the properties, obtaining tax data and maps, collecting and analyzing comparable sales data

---

crimination. *See also Wesson v. Town of Bremen,* 667 A.2d 596, 598 (Me.1995) (stating that *Moser* modified *Farrelly*). The "language of 'potential'

in *Farrelly* ... is not particularly helpful; *'necessary'* is the important word." *Moser,* 553 A.2d at 1250 (emphasis in original).

and applying a cost approach. After arriving at a fair market value for each of the fifteen sample properties and comparing that value with the assessed value, the appraiser's opinion was that the Granite Point properties were overassessed by an average of 20% for 1993 and 29% for 1995. Biddeford had already granted partial adjustment for tax year 1995 of 6.5%,[4] and, therefore, the appraiser concluded the properties were actually overassessed by 22.5% in 1995. The expert's opinion of the 20% overassessment for 1993 was confirmed when he did a study of actual sales in Granite Point from 1993 to 1995. That study revealed that the assessments of the nine sale properties during that time period averaged 120% of the sale price.

[¶ 22] Biddeford contends that the Board could not make a finding of unjust discrimination without first finding overvaluation and cites *City of Waterville v. Waterville Homes, Inc.*, 655 A.2d 365 (Me.1995) for this proposition. That case, however, does not involve unjust discrimination; there is nothing in the opinion indicating that the taxpayer attempted to show anything other than substantial overvaluation. That case stands for the proposition that in order to prove substantial overvaluation the taxpayer must present affirmative evidence of valuation and cannot rely on impeaching the assessor's conclusion of value. *Id.* at 366–67. In *Moser*, 553 A.2d at 1250, we held that unjust discrimination could be established by a showing that the assessment method would necessarily result in unequal apportionment, and when taxpayers make that showing they do not also have to demonstrate that the property is substantially overvalued. In fact, in this case the taxpayers have demonstrated that in the aggregate the Granite Point properties were overvalued, although they did not show individual property overvaluation. Where, as here, the revaluation was based on a discriminatory formula, the taxpayers need not demonstrate overvaluation of each individual property in order to prove unjust discrimination.

### III.  Remedy for Unjust Discrimination

[¶ 23] The taxpayers demonstrated for the Board the mathematical formula to translate the overassessment percentages of 20% for 1993 and 22.5% for 1995 into appropriate percentage adjustments to achieve a 100% assessment. The Board utilized the formula and determined that an adjustment in the 1993 assessments of 16.7% and an adjustment for 1995 of 18.3% would achieve the appropriate result. Biddeford argues that the fifteen-property sampling the appraiser used to determine the overassessment percentages is not a sufficient basis upon which the Board could order the 16.7% and 18.3% adjustments because it does not relate to the basis of the discrimination.

[¶ 24] Neither Maine case law nor the tax abatement statute provide guidance on the appropriate remedy for unjust discrimination, except that if the Board thinks the property is overvalued, it "shall grant such reasonable abatement as it thinks proper." 36 M.R.S.A. § 843(1–A) (Supp.1998). In the only case to touch directly on the issue of remedy in a discrimination case, *Farrelly v. Inhabitants of the Town of Deer Isle*, 407 A.2d 302, 307 (Me.1979), *overruled on other grounds by Moser*, 553 A.2d at 1250, this Court affirmed the decision of a referee granting an abatement on the grounds of discrimination. The referee in *Farrelly* ordered an abatement on the taxpayer's 1976 taxes in the amount they exceeded his 1975 taxes. *Id.* at 304.

[¶ 25] In this case the Board found, for purposes of unjust discrimination, that the properties were overvalued by an average of 20% and 22.5% for the relevant tax years. It determined that the appropriate remedy was to grant abatements in amounts that would eliminate the average overvaluation. Under the statute the Board was required to grant abatements in reasonable amounts and in amounts it determined to be proper. We cannot say that the Board abused its discretion or committed an error of law in granting the abatements that it did. This is not to say that abatements which

---

4.  After an update was conducted for the April 1, 1996 assessment date, the assessor reduced the assessments of those taxpayers who filed for abatements on tax year 1995 by 6.5% because that figure was half of the expected reduction in assessments for tax year 1996.

were more closely related to the discriminatory practices would have been inappropriate.

[¶ 26] The Board only has power to grant abatements and does not have the authority to remand the case to the assessor to recompute the tax. *See Muirgen Props., Inc. v. Town of Boothbay*, 663 A.2d 55, 58 (Me.1995) (interpreting same language in 36 M.R.S.A. § 844(1) (Supp.1998) with respect to power of County Commissioners). Thus, it was unable to send the matter back to the assessor to require a recalculation that would eliminate the inequitable practices; that is, to recalculate the assessment with the 12.5% reduction in the neighborhood factor and a redetermination of the median lot size. Neither the taxpayers nor Biddeford presented evidence to the Board of what the assessments would be without the discriminatory practice. Without such evidence the Board was not required to attempt a calculation on its own. We cannot conclude that the Board was in error when it utilized the average overvaluation percentages and granted abatements designed to eliminate the overvaluation.

The entry is

Judgment affirmed.

