STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-09-026

RICHARD C. MOORES, III,

      Plaintiff

v.

**ORDER**

TOWN OF NEWFIELD, MAINE,

      Defendant

Appellant Richard C. Moores, III, appeals from the Board of York County Commissioners' denial of his tax abatement appeal.

## BACKGROUND

Richard C. Moores, III, owns three waterfront lots on Balch Lake in the Town of Newfield, Maine. (R. at 1.) The lots are identified as numbers 101, 102, and 103 on Tax Map 62. (R. at 3.) Lot 102 is small and not part of this appeal. (R. at 12.) Lot 101 has approximately 284 feet of riparian frontage across two of its sides. (*See* R. at 114.)

For tax year 2006, the Town of Newfield contracted with Parker Appraisal Co. to conduct a town-wide revaluation. (R. at 3.) Robert Gingras of Parker Appraisal was retained as the Town's assessing agent for the revaluation. (R. at 3.) Mr. Gingras, who has been an assessing agent for thirty years, applied the "land residual method" to five representative property sales and determined that Newfield property on Balch Lake should be valued at $3,000 per foot of shore frontage. (R. at 3–4, 35.) This value would then be adjusted to account for factors such as lot depth, excess or deficient frontage, and other unique characteristics. (R. at 3.) Mr. Gingras also determined that the per-

front-foot values for properties on other lakes in Newfield were significantly lower than $3,000. (R. at 4.)

In tax years 2007-2008 and 2008-2009, Mr. Moores's Lots 101, 102, and 103 were respectively assessed at the following values: (1) $530,300 ($450,000 attributed to land); (2) $8,400 (vacant lot); and (3) $397,000 ($297,000 attributed to land). (R. at 3.) Mr. Moores applied for property tax abatements for these years and was denied by the Town Selectmen acting as assessors. (Pet. Br. at 2.) Mr. Moores appealed the denial for both years to the Board of York County Commissioners pursuant to 36 M.R.S.A. § 844(1). (Pet. Br. at 2.) The Board took documentary and testimonial evidence at a hearing on May 15, 2009. (Pet. Br. at 2.)

Mr. Moores argued that his properties were substantially overvalued and that their valuations were unjustly discriminatory. Jeffrey Patterson, a real estate appraiser licensed in Maine and New Hampshire, independently appraised Mr. Moores's properties and testified on his behalf. (R. at 4.) To appraise the value of Mr. Moores's properties, Mr. Patterson examined approximately twenty-four sales of properties that occurred between the years 2006 and 2008. (R. at 16.) Some of these properties were located on Balch Lake in Newfield, but some of the Newfield properties were located on Rock Haven Lake and other properties on Balch Lake were located in Acton, Maine, or Wakefield, New Hampshire. (R. at 76, 174.)

Based on his professional analyses, Mr. Patterson testified that the fair market value of Mr. Moores's Lot 101 was $330,000 in 2007 and $335,000 in 2008, and that the value of Lot 103 was $340,000 in 2007 and $345,000 in 2008. (R. at 18–19.) The Lots had been assessed at 158% and 124% of these values. (Pet. Br. at 3–4.) Mr. Patterson also opined that Newfield properties on Rock Haven Lake had fair market values

approximately 20% lower than properties on Balch Lake, but had been assessed at approximately 50% less. (R. at 21–22.)

At the hearing, Mr. Moores's counsel also questioned Mr. Gingras about the specific shape of Lot 101 and the calculation of its riparian frontage. (R. at 31.) Mr. Gingras testified that where a lot borders water on multiple sides, the practice was to reduce the total frontage by an average of the lot's depth. (R. at 31.) In this way one side would be considered part of the depth, and the only "frontage" would be along the front. (R. at 31.)

The Town of Newfield began its case by establishing Mr. Gingras's qualifications and the methods he used to assess property in the Town. (R. at 35, 37–41; *supra* at 1.) Counsel for the Town then turned to the properties Mr. Patterson used in his comparative analysis. (R. at 41–42.) Mr. Patterson presented five different property sales to appraise Mr. Moores's Lots, with a sixth sale from Rock Haven Lake for comparison. (R. at 41–42, 201–03.) Mr. Gingras criticized Mr. Patterson's first comp for having been a mother-to-daughter sale and for having been adjusted by approximately 40%. (R. at 42, 270–71.). He did not fault comp number three, which Mr. Patterson appraised above the property's actual sale price and above Mr. Gingras's assessment, but he did criticize the fifth comp because it had received a 10% discount for rough terrain and still had to be adjusted by another 36%. (R. at 43–44.) Mr. Gingras dismissed the second and fourth comps because they were in Wakefield, New Hampshire, and he dismissed the sixth comp because it was located on Rock Haven Lake rather than Balch Lake. (R. at 43–44.) Summing up his critique, Mr. Gingras stated: "These aren't comparables. . . . And that's why my figures and his figures are so different. . . . [A]ll five of my sales are on Balch Lake, in the Town of Newfield." (R. at 44.)

Mr. Gingras also testified that he had applied his assessment method consistently and impartially to every property in Newfield, and noted that Mr. Moores's Lot 103 had received discounts for having 125 feet of water frontage and only 74 feet of depth. (R. at 45–47.) He then began to analyze assessment ratios provided by the State Property Tax Division. In 2007 residential property in Newfield was generally assessed at 53% of fair market value, with water-influence property being assessed at an average of 34% fair market value.[1] (R. at 48, 228.) After the revaluation in 2008 and 2009, these numbers jumped to 105% and 94%, respectively. (R. at 49, 50, 228, 237.) The 2008 data showed that water-influenced properties on Balch Lake were assessed at 94% of their fair market value on average, increasing to 105% in 2009. (R. at 49–51, 235, 242.) These ratios all met the town-wide standards set by the state, and Mr. Gingras testified that he would not "chase sales" to adjust the assessments of individual properties on a rolling basis because doing so would lead to increasingly inequitable assessments. (R. at 50–52.)

Before finishing, Mr. Gingras stated that different bodies of water required different valuations because not all waterfront property commanded the same market price. (R. at 52–53.) On rebuttal, Mr. Moores's counsel pointed out that the State's 2009 analysis of Balch Lake showed that while all water-influence properties were assessed at 105% of their fair market value on average, the properties with actual riparian frontage were appraised at an average of 135% their fair market value. (R. at 54, 242, 290–91, 300.) He also argued that the State's data showed that riparian property on Rock Haven Lake was assessed at 99% of fair market value on average, emphasizing the disparity between the two lakes. (R. at 54, 242–43.)

---

[1] These percentages were based on sales data from the preceding two years. Water-influenced properties include back lots as well as lots with riparian frontage.

Both parties submitted supplemental filings to the Board after the hearing. Mr. Moores submitted the affidavit of Mr. Patterson, in which Mr. Patterson defended his data and methods. (R. at 200–03.) He provided reasons to believe that the sale identified as a mother-to-daughter transaction was in fact an arm's-length market transaction, and disputed Mr. Gingras's assertion that properties with adjusted values were not reliable indicators of market value. (R. at 202–03.) He also stated that his research indicated that the market for property on Balch Lake did not discriminate between municipalities, making the entire lake one comparable market. (R. at 203.) The Town submitted a letter correcting an error in the State's 2009 Sales Ratio Analysis. (R. at 290–91.)

After making numerous and detailed findings of fact, the Board of York County Commissioners concluded that Mr. Moores had "not satisfied his burden to establish that the property [was] overvalued or that the Town's assessment constitute[d] illegal discrimination." (R. at 6.) The Board found that Mr. Gingras had used "the best available comparable sales data to" assess Mr. Moores's property, concluding:

> In contrast with a number of the properties offered by Mr. Patterson as comparables, the sales used by Mr. Gingras to build his assessments were located in the same Town and on the same body of water as Mr. Moores' [sic] property. All towns and lakes are not created equal. We note that different lakes, even within the same town, can command significantly different prices. Accordingly, we prefer the comparables offered by Mr. Gingras to those offered by Mr. Patterson because they compare "apples to apples" and "oranges to oranges."

(R. at 6.) In so finding, the Board expressly acknowledged that it could consider sales data from outside Newfield but did not find those sales persuasive in this case. (R. at 6.)

The Board also found that Mr. Gingras had applied his assessment method consistently to all Newfield properties on Balch Lake, and no discrimination had occurred because "all parcels of the *same class* were assessed consistently." (R. at 6 (citing *Bristol Taxpayers Assoc. v. Town of Bristol*, 2008 ME 159, ¶ 12, 957 A.2d 977, 980).)

Finally, the Board found that the State's reports did not conclusively support Mr. Moores's overvaluation claim because some properties around Balch Lake did sell for more than their assessed value, and because one of the properties might not have been an arm's-length sale. (R. at 6.) "Based on the foregoing," the Board found that "the appellants have not satisfied their burden of presenting sufficient evidence to impeach the validity of the Town's assessment." (R. at 7.)

Mr. Moores now appeals from the Board's decision pursuant to M.R. Civ. P. 80B.

## DISCUSSION

"Article 9, section 8 of the Maine Constitutions requires that 'all taxes upon real and personal estate . . . shall be apportioned and assessed equally, according to the just value thereof.'" *City of Biddeford v. Adams*, 1999 ME 49, ¶ 14, 727 A.2d 346, 349 (emphasis added). "'Just value' must reflect the fair 'market value.'" *Muirgen Props., Inc. v. Town of Boothbay*, 663 A.2d 55, 58 (Me. 1995) (quoting *Shawmut Inn v. Town of Kennebunkport*, 428 A.2d 384, 389 (Me. 1981) (internal quotations omitted). "A town's assessment is presumed valid and the taxpayer must prove it is manifestly wrong." *Adams*, 1999 ME 49, ¶ 13, 727 A.2d at 349. To show that an assessment is manifestly wrong, "a taxpayer must prove that one of three situations exists:

> (1) The judgment of the assessors was irrational or so unreasonable in light of the circumstances that the property is substantially overvalued and an injustice results;
>
> (2) There was unjust discrimination;
>
> or
>
> (3) The Assessment was fraudulent, dishonest, or illegal."

*Muirgen Props., Inc.*, 663 A.2d at 58.

On appeal from the Board of York County Commissioners, this Court reviews the Board's "decision for abuse of discretion, error of law, or findings unsupported by

substantial evidence in the record." *Muirgen Props., Inc.*, 663 A.2d at 58. The Court "will vacate the Commissioners' conclusion that the taxpayer failed to meet this burden 'only if the record compels a contrary conclusion to the exclusion of any other inference.'" *Yusum v. Town of Raymond*, 2001 ME 61, ¶ 9, 769 A.2d 865, 870 (quoting *Weekley v. Town of Scarborough*, 676 A.2d 932, 934 (Me. 1996)) (internal quotations omitted).

**1.     Errors of Law**

Mr. Moores contends that the Board made two critical legal errors. First, he argues that the Board articulated an incorrect legal standard for establishing overvaluation. In its findings of fact, the Board stated:

> To establish overvaluation, the taxpayer must: (1) present evidence that that [sic] Board accepts as credible that impeaches the validity of the assessment; and (2) provide evidence and proof of the actual fair market value of the applicant's property that the Board also deems credible. Only if the taxpayer satisfies both of these burdens is the Board authorized to engage in an independent determination of the fair market value of the property for purposes of granting an abatement. [*Yusem*, 2001 ME 61, ¶ 8, 769 A.2d 865, 869–70]; *Town of Southwest Harbor v. Harwood*, 2000 ME 213, ¶ 7, 763 A.2d 115, 117.

(R. at 2.) This is an imprecise statement of the law insofar as it implies that a method of assessment must be proven invalid before a property can be deemed overvalued. The Law Court has never required a taxpayer to impeach the validity of a *method* of assessment. *See Harwood*, 2000 ME 213, ¶¶ 11 & 15, n. 4, 763 A.2d at 118–19 (evidence of unjustified overvaluation compared to readily ascertainable fair market price sufficient to establish substantial overvaluation despite consistent and valid assessment method).

The oft-stated test of overvaluation requires a taxpayer to prove that "[t]he judgment of the assessors was irrational or so unreasonable in light of the circumstances that the property is substantially overvalued and an injustice results." *Muirgen Props., Inc.*, 663 A.2d at 58. This does not *per se* require a taxpayer to impeach the method by which an assessor arrives at an assessment. However, to show that an assessment is

7

"irrational" or unjustly "unreasonable" will necessarily require a taxpayer to impeach the validity of the property's assessment and do so by establishing an alternative fair market value. *See Northeast Empire P'Ship # 2 v. Town of Ashland*, 2003 ME 28, ¶ 7, 818 A.2d 1021, 1024 (citing *Yusum*, 2001 ME 61, ¶ 13, 769 A.2d at 871–72) (taxpayer must present credible evidence of property's value to show substantial overvaluation). In this sense the Board's statement of the law is correct. However, "[t]here is no suggestion in the findings of the Board that it actually applied an erroneous standard." *McCullough v. Town of Sanford*, 687 A.2d 629, 631 (Me. 1996).

Mr. Moores claims that the Board's second legal error came when it "erroneously concluded that Mr. Patterson's opinions of value must be rejected because he utilized comparable sales from other [t]owns." (Pet. Br. at 15–16.) The petitioner argues that the Board could not reject out-of-town sales without pointing to some basis in the record for doing so, that the Board did not have any such basis in this case, and that the petitioner's evidence compels a ruling in his favor. (Pet. Br. at 16–18; Pet. R. Br. at 10.)

In *Cruz v. Town of Newfield*, this Court found that the law has not required assessors to consider out-of-town sales information when developing an appraisal formula. *Cruz v. Town of Newfield*, ALFSC-AP-07-036 (Me. Super. Ct., Yor. Cty., Sept. 23, 2008) (Brennan, J.) (citing *Wesson v. Town of Bremen*, 667 A.2d 596, 597 n.1 (Me. 1995)). Applied to this case, *Cruz* merely stands for the proposition that the Town of Newfield's assessment formula is not invalid merely because the $3,000 per-foot figure was derived only from in-town sales.

Unlike the municipal body that crafts the assessment formula, the reviewing body's role is to ensure that the formula produces just and equitable results. *See Adams*, 1999 ME 49, ¶ 14, 727 A.2d at 349. In both *Spickschen v. Town of Newfield*, 2007 Me. Super. LEXIS 218 (Oct. 29, 2007) and *Heron Island Village Improvement Society v. Property Owners*

*of Inner Heron Island*, 1999 Me. Super. LEXIS 161 (June 9, 1999) the courts made it clear that the Board of County Commissioners could not ignore comparable data from other towns when evaluating an assessment merely because the sales occurred in a different municipality. *See FMC Corp. v. Assessor of Town of Tonawanda*, 699 N.E.2d 893, 897 (N.Y. 1998) ("Comparable properties may even lie outside of the local market of the subject property when evidence indicates that a broad regional market exists."). The Board must consider such data to help determine whether an assessment justly reflects the property's fair market value. If the Board rejects out-of-town sales data, it must state why the sales were not truly comparable based on evidence in the record. *See Heron Island*, 1999 Me. Super. LEXIS 161 (June 9, 1999) (holding that the Board erred when it failed to explain why it rejected evidence of out-of-town sales, and that rejecting such sales solely for being from a separate jurisdiction would be legally erroneous).

Here, the Board expressly acknowledged that sales data from other towns and nearby areas could be considered. (R. at 6 (citing *Cruz v. Town of Newfield*, ALFSC-AP-07-036 (Me. Super. Ct., Yor. Cty., Sept. 23, 2008) (Brennan, J.) (citing *Wesson v. Town of Bremen*, 667 A.2d 596, 597 n.1 (Me. 1995))).) However, the Board believed it was free to disregard that data and cited the testimony of Mr. Gingras as evidence that sales from other municipalities were not truly comparable. (R. at 6.) Mr. Gingras's testimony on this point was that he did not have to utilize data from other towns, and did not do so. (R. at 43–44.) He did not testify as to whether property values differed between the towns or why, and this information does not appear anywhere else in the record. This leaves the Board in the position of having rejected the out-of-town sales data solely because it did not come from Newfield. This reason is legally insufficient, and the data must be considered on remand.

## 2. Erroneous Findings of Fact

Mr. Moores claims that the Board made factual errors. First, he attacks the Board's findings regarding the calculation of his riparian frontage and the characterization of his terrain. Second, he claims that the Town did not offer substantial evidence to impeach Mr. Patterson's in-town sales data. Third, Mr. Moores claims that the only reasonable interpretation of the State's 2008 and 2009 Sales Ratio Analyses supports his position rather than the Town's.

At an assessment review hearing, the Board receives oral and documentary evidence of the kind "upon which reasonable persons are accustomed to rely in the conduct of serious affairs." 5 M.R.S.A. § 9057(2) (2009); 36 M.R.S.A. § 844-M(4) (2009). "Each party may present its case or defense by oral or documentary evidence, submit rebuttal evidence and conduct cross-examination that is required for a full and true disclosure of the facts." 36 M.R.S.A. § 844-M(4). After taking evidence, the Board was required to make findings of fact on the record "with a level of specificity that is 'sufficient to appraise [sic] the applicant and any interested member of the public of the basis for the decision.'" *Yusum*, 2001 ME 61, ¶ 17, 769 A.2d at 872 (quoting *Christian Fellowship and Renewal Ctr. v. Town of Limington*, 2001 ME 16, ¶ 14, 769 A.2d 834, 838) (internal quotations omitted).

On appeal, the court reviews the whole record to determine if the Board's conclusions and findings are supported by substantial evidence. *Town of Vienna v. Kokernak*, 612 A.2d 870, 872 (Me. 1992). "That the record contains evidence inconsistent with the result, or that inconsistent conclusions could be drawn from the evidence, does not render the commissioners' findings invalid if a reasonable mind might accept the relevant evidence as adequate to support the commissioners' conclusions." *Id.*

### a. The Frontage and Character of Lot 101.

The Board found that Lot 101 did not have swampy portions entitling it to a discount, and erroneously found that Lot 101 "has approximately 345 feet of shore frontage . . . [but] was only taxed on 200 feet." (R. at 5.) Regarding the alleged "swampiness" or "muckiness," the only evidence on the question was somewhat confusing testimony of Town Newfield selectman Bruce Caldwell and a certain photograph presented by the Town. (Pet. R. Br. at 4.) Mr. Caldwell testified that he believed part of Lot 101 was swampy and would receive a discount, but that the relevant area had been excluded when the assessors calculated the Lot's frontage. (R. at 27–30.) In the Board's findings of fact, it ignored the testimony of Mr. Caldwell and concluded that the photograph "did not suggest that Mr. Moores' [sic] property was characterized by swampy frontage." (R. at 5.)

The Board erroneously found that Lot 101 has 345 feet of shore frontage. (*Compare* R. at 5 *with* R. at 114.) The Tax Map shows that Lot 101 has approximately 284 feet of shore frontage. (R. at 114.) Furthermore, while most properties' frontage was calculated by the straight-line method, Mr. Caldwell testified that this was not done for Lot 101. (R. at 29–30.) Mr. Gingras elaborated and testified that an irregularly shaped lot with shore frontage on multiple sides would be squared off and "charge[d] frontage and an average depth of a hundred feet." (R. at 31.) Questions were raised as to whether a certain island or peninsula was included in the calculation of Lot 101's frontage, but were not pursued or resolved. (R. at 27, 31.)

The record shows that Lot 101 was assessed for 200 feet of shore frontage, and an average depth of 93 feet, for a total of 293 feet around two sides of the property. (R. at 112.) The Lot was then given a 25% discount for excess frontage, such discount totaling $150,000. (R. at 112.) This calculation does not match what Mr. Gingras's testified was

his regular practice of using a 100-foot depth. Furthermore, if the average depth had been subtracted from the frontage then it appears that Mr. Moores would have been assessed for 191 feet rather than 200, a difference of $27,000.

The Board did not address these discrepancies. Instead, it concluded that Mr. Moores had "not satisfied his burden to establish that the property is overvalued or that the Town's assessment constitutes illegal discrimination." (R. at 6.) While the Board found that the photographs did not suggest that the property was swampy, it also found that the swampy portion was among the "145 feet of Lot 101's shore frontage" not included for assessment purposes. (R. at 5.) The record clearly shows that 145 feet of shore frontage was not excluded from Lot 101's assessment, but is less clear on how Lot 101's frontage actually was calculated. Given this lack of clarity and the connection between the frontage calculation and the character of the property, the Board's error was probably not harmless. The inconsistency and ambiguity in the record requires that this question be remanded for clarification.

**b.    Mr. Patterson's Sales Data From the Town of Newfield**

Mr. Moores claims that the Board arbitrarily found that the in-town sales data used by Mr. Patterson was not credible. One of the properties Mr. Patterson relied on was transferred from a mother to a daughter before being sold to a third party. (R. at 42.) Mr. Gingras testified that he wouldn't consider that sale because it was probably "not a legitimate sale." (R. at 42.) The same property and one other also received adjustments of over 40%. (R. at 42–44). Mr. Gingras testified that properties receiving such adjustments were not comparable properties. (R. at 42.) Mr. Gingras did not offer any explanation of or basis for these assertions. (R. at 42–44.) Mr. Patterson rebutted Mr. Gingras's opinions in a post-hearing affidavit. (R. at 200–03.) In the affidavit Mr. Patterson stated that research showed the mother-daughter sale was in fact a fair

12

market transaction. (R. at 202.) He also defended the use of adjusted properties as standard practice among appraisers and attacked Mr. Gingras's opinion as baseless. (R. at 202–03.) The Board chose to credit Mr. Gingras. (R. at 5–6.)

Mr. Moores now argues that Mr. Gingras's unsupported opinions were a legally inadequate basis on which the Board could discredit Mr. Patterson's evidence. Mr. Gingras's testimony was not challenged at the hearing, nor were his credentials as an expert assessor. While his testimony might not satisfy the strict rules of evidence, the opinions of an assessing agent with thirty years of experience are the sort of evidence "upon which reasonable persons are accustomed to rely" when evaluating assessment or appraisal evidence. 5 M.R.S.A. § 9057(2) (2009). While this calls into question the weight to be assigned to Mr. Gingras's testimony, the Court is not compelled to overturn the Board on this point. However, the Board may wish to revisit this evidence on remand and consider it with other improperly excluded data.

### c. The State's 2008 and 2009 Sales Ratio Analyses

The Board found that the State Property Tax Division's Report of Assessment Review data for years 2006 and 2007 did not support Mr. Moores's overvaluation claim. (R. at 6.) Mr. Moores claims that this conclusion was erroneous and that the Board did not look at the relevant data. The Town counters that the average town assessment ratios meet the State's minimum standards, making the assessments protected under 36 M.R.S.A. § 848-A (2009).

First, 36 M.R.S.A. § 848-A makes it "a sufficient defense of [an] assessment that it is accurate within reasonable limits of practicality, except when a proven deviation of 10% or more from the relevant assessment ratio of the municipality or primary assessing area exists." The petitioner claims that the assessed value of his property is substantially higher than its just value. This constitutes a challenge to both the standard

of deviation and the notion that his property was assessed accurately within the reasonable limits of practicality. Section 848-A cannot apply while the just values of Mr. Moores's Lots remain in doubt.

Turning to the State's data, it shows that in 2005 residential property was assessed at an average of 53% its fair market value, and all waterfront property was assessed at an average of 39% fair market value. (R. at 228.) After the revaluation in 2006, these numbers respectively jumped to 105% and 94% in 2006 and 104% and 95% in 2007. (R. at 228, 237.) While properties around Balch Lake were generally selling for more than their assessed value in 2005 before the revaluation, this changed in 2006. (R. at 235.) In that year four properties were sold around Balch Lake. (R. at 242.) Two were back lots not assessed at the $3,000 per-foot rate. (R. at 242.) These sold for more than their assessed value. One property was a back lot with a separate, narrow, unbuildable waterfront parcel used for docking a boat; it also sold for more than its assessed value. (R. at 242, 290–91, 301–02.) The only property with substantial frontage on Balch Lake that sold in 2006 fetched a price 18% lower than its assessed value.[2] (R. at 242.)

In 2007 two back-lot properties around Balch Lake were assessed at an average of 104% of their sales prices. (R. at 242.) Properties that fronted on Balch Lake all sold for prices lower than their assessed values. (R. at 242.) These waterfront properties were assessed at an average of 127% their fair market values. (R. at 242.) One of these sales was the transaction involving a mother, daughter, and third party. (R. at 242; 266–71.) Excluding this sale, the Balch Waterfront properties were assessed at an average of 123% their fair market values. (R. at 242.)

Together, the State's data show that after the 2006 revaluation, only one "waterfront" property on Balch Lake sold for more than its assessed value. (R. at 242.)

---

[2]     Expressed in a different way, the property's assessed value was 122% of its sale price.

This property was an undevelopable access strip with only eleven feet of riparian frontage. (R. at 290–91, 301–02.) Other Balch waterfront property, excluding the suspect mother-daughter sale, has been assessed at an average of 123% its fair market price. (R. at 242.) Of these sales, the most expensive property sold for $265,000. (R. at 242.) The record shows that the highest-price sale since 2005 was for $385,000. (R. at 235.)

After examining this sales data, the Board concluded "that certain properties on Balch Lake sold for less than their assessed value and other [sic] sold for more. . . . The State's Reports of Assessment Review do not support Mr. Moores' [sic] overvaluation claim." (R. at 5–6.) The record appears to compel a contrary conclusion. While back-lot properties around Balch Lake have continued to sell for more than their assessed value, these sales are irrelevant to the question at hand. Mr. Moores is challenging the assessment of his waterfront properties, which were assessed differently from the neighboring back lots.[3] Since the back lots were not assessed at $3,000 per foot of frontage, their sales data are not relevant to the valuation of the riparian properties. Given that the only riparian property to sell for more than its assessed value was in substance a back lot with a right-of-way, the Board's finding that "certain properties on Balch Lake . . . sold for significantly more than their assessed values" is questionable. (R. at 6.) In fact, the record shows that no waterfront properties on Balch Lake have sold for more than their assessed values since the 2006 revaluation.

Mr. Moores presses further and contends that the State's reports compel a ruling in his favor. In *Weekley v. Town of Scarborough* the Law Court found that evidence showing the taxpayer's properties were assessed at 147% and 128% of their recent sales

---

[3] The fact that the properties are situated differently underlies and supports the Town's defense against the charge of unjust discrimination. If the properties are similarly situated so as to be comparable on the overvaluation claim, then the Town had no justifiable reason to assess the waterfront lots on Balch Lake differently from the back lots.

prices compelled the conclusion that they had been substantially overvalued. 676 A.2d 932, 933–34 (Me. 1996). From this, Mr. Moores argues that the State's data showing Balch Lake properties being assessed at 123% of their sales prices, taken with Mr. Patterson's opinion that his properties are assessed at 158% and 124% of their fair market value, compels the conclusion that his properties have been overvalued.

The key fact in *Weekley* was that the taxpayer had purchased his land on the open market two years before it was revalued for assessment. *Id.* at 933. This sale formed conclusive evidence of the disputed properties' just values, enabling the court to determine that they had been overvalued as a matter of law. *Id.* at 934. By contrast, the fair market values of Mr. Moores's properties must be estimated through appraisal methods and remain in doubt. The Town has assessed the properties at $530,300 and $397,000, while Mr. Patterson has appraised them at $335,000 and $325,000. While the State's data might lend credence to the petitioner's case, the sale prices of four different properties do not compel the conclusion that Mr. Patterson's opinions about the petitioner's properties are correct.

3.     **Unjust Discrimination**

"[T]axpayers can prove discrimination only if they show that the assessor's system necessarily results in unequal apportionment." *Ram's Head Partners, LLC v. Town of Cape Elizabeth*, 2003 ME 131, ¶ 10, 834 A.2d 916, 919 (quoting *Adams*, 1999 ME 49, ¶ 14, 727 A.2d at 349) (quotations omitted). "The constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners." *Id.* (quoting *Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336, 345 (1989)) (quotations omitted). While "[t]he undervaluation of one set of similarly situated properties can support a finding of unjust discrimination . . . 'sporadic differences in valuations,' or 'mere errors of judgment on the part of the assessors' do not necessarily

establish unjust discrimination." *Id.* ¶ 11, 834 A.2d at 919 (quoting *Kittery Elec. Light Co. v. Assessors of the Town of Kittery*, 219 A.2d 728, 740 (Me. 1966)) (internal citations omitted). To show discrimination the taxpayer must prove drastic differences in the valuation of similarly situation properties, "and that any rationale" for the difference "is unfounded or arbitrary." *Id.* ¶ 12, 834 A.2d 916, 920.

Mr. Moores claims that the Town of Newfield has unjustly discriminated against properties located on Balch Lake. For evidence, he relies on the testimony of Mr. Patterson and on the State's Reports of Assessment Review that show a sales ratio of 98% for Rock Haven Lake waterfront compared to 126% for Balch Lake waterfront. (Pet. Br. at 20.) When faced with this evidence, the Board concluded that "the Town consistently applied [an acceptable] method to Mr. Moores' [sic] property and to all other properties on Balch Lake (and to properties situated on other lakes in the Town.) Accordingly, we find no discrimination occurred." (R. at 6.)

In the past, the Law Court has found unjust discrimination where an "assessor had arbitrarily granted a discount to one neighborhood based on his 'gut feeling,'" and cited instances where an assessor "ignored recent sales because he thought the buyers were paying too much." *Id.* ¶ 13, 834 A.2d at 920 (citing *Adams*, 1999 ME 49, ¶ 3, 727 A.2d at 348; *State ex rel. Levine v. Bd. of Review*, 528 N.W.2d 424, 428 (Wis. 1995)). Here, the record shows that the assessment of properties on Balch Lake was based on sales data from Balch Lake, and the assessment of properties on Rock Haven Lake was based on sales data from Rock Haven Lake. (R. at 4–5, 36–37, 39–40.)

From this, the Board could easily conclude that the differences in sale data between the two lakes constituted a fair and non-arbitrary basis for the different treatment. (R. at 6 ("All towns and lakes are not created equal.").) Accepting that there was an objective basis for valuing properties on Balch Lake in a different class from

properties on Rock Haven Lake, a subsequent disparity between the two classes does not alone compel the conclusion that unjust discrimination is present. *See Ram's Head Partners, LLC*, 2003 ME 131, ¶ 11, 834 A.2d at 919. The Board's conclusion that no unjust discrimination occurred was legally correct and supported by substantial evidence in the record.

## CONCLUSIONS

This case concerns the assessments of two distinct properties, but has become a debate about the merit and validity of the Town of Newfield's assessment method. Mr. Moores presented evidence of his properties' current fair market values, and argued that the Town's assessment was unreasonably high. He also presented data allegedly showing that his property, with all other properties on Balch Lake, was unjustly discriminated against.

The Town did not present any evidence concerning the current fair market values of Mr. Moores's properties. Instead, it showed how it calculated assessments on Balch Lake. Its argument against Mr. Moores was essentially that since its formula was facially valid and was derived from in-town lakefront sales data, the formula's results must be superior reflections of just value. While it offered no evidence to support the justness of Mr. Moores's current assessments, it did attempt to impeach Mr. Moores's evidence.

The burden of persuasion is on Mr. Moores. The Board of York County Commissioners correctly determined that he has failed to show unjust discrimination. However, in evaluating Mr. Moores's evidence of overvaluation the Board erred. It dismissed comparable sales data from other towns without providing a legally adequate basis. It made findings regarding Lot 101's riparian frontage without substantial support in the record. Finally, it drew a conclusion from relevant sales data

18

opposite that which the record compels. These errors prevented the Board from fairly evaluating the merits of Mr. Moores's overvaluation claim.

Thus, the Court affirms the Board's denial of the unjust enrichment claim, but vacates the denial of the overvaluation claim and remands for reconsideration. On remand, the Board should consider the merits of all of Mr. Moores's evidence of fair market value. If the Board finds some evidence unpersuasive, it should clearly articulate the basis and reasoning for its determination. The Board should also clarify how the frontage of Lot 101 was calculated and assessed.

Dated:     April 5 , 2010

G. Arthur Brennan
Justice, Superior Court

ATTORNEY FOR PLAINTIFF:
BRUCE A. MCGLAUFLIN, ESQ.
PETRUCCELLI MARTIN & HADDOW
PO BOX 17555
PORTLAND ME   04112-8555

ATTORNEY FOR DEFENDANT:
LEAH B. RACHIN, ESQ.
BERGEN & PARKINSON
62 PORTLAND RD
KENNEBUNK ME   04043